STINE et al. v. OASIS OIL CO.   (No. 11630.)*

(Court of Civil Appeals of Texas. Fort Worth. Nov. 20, 1926. Rehearing Denied Jan. 15, 1927.)

1. Mines and minerals ⬦⟺78(2)—Lessors could not cancel oil and gas lease for lessee's failure to drill wells 2,000 feet deep, where drilling operations had been continuous, exempting lessee from forfeiture under lease.

Lessors *held* not entitled to cancellation of oil and gas lease because of lessee's failure to drill each well to depth of 2,000 feet, though lease provided such failure should forfeit lessee's rights unless lessee was prevented from so doing by causes not within his control, where lease also provided that there should be no forfeiture so long as drilling operations were continuous, lessee having drilled wells continuously up to date of suit, though certain wells were not continued to required depth because found to be dry.

**2. Mines and minerals ⬦⇒78(2)—Under oil and gas lease, drilling held continuous, barring forfeiture, where suit for cancellation was commenced within 90 days after completing first well.**

Where oil and gas lease provided drilling should not cease for period of 90 days, drilling under lease *held* continuous, exempting lessee from payment of cash rental and from forfeiture, where suit for cancellation of lease was instituted less than 90 days after first well had been finished, five other wells having been drilled.

**3. Mines and minerals ⬦⇒78(1)—Duty of lessee under oil and gas lease to pursue drilling operations diligently is implied.**

Lessee, under oil and gas lease, is under implied obligation to pursue drilling operations with due diligence.

**4. Mines and minerals ⬦⇒78(2)—Lessors of oil and gas property who repudiated lease could not claim forfeiture for lessee's failure to drill after repudiation.**

Where lessors repudiated oil and gas lease and instituted suit for cancellation, they could not claim forfeiture by lessee for failure to drill wells after date of repudiation.

**5. Alteration of instruments ⬦⇒18—Where one of triplicate original copies of lease was altered by lessee, alteration though fraudulent held insufficient ground for cancellation.**

In lessors' action to cancel oil and gas lease executed in triplicate, lessee's alteration of one of original leases by substitution of word "the" for "each" in regard to duty to drill each well 2,000 feet deep *held* not ground for cancellation, assuming alteration was with fraudulent intent to gain advantage thereby, inasmuch as remaining unaltered instruments were sufficient to sustain contract.

**6. Trial ⬦⇒178—Refusal of court to assign reason for directing verdict held not reversible error in action to cancel lease.**

Refusal of court to embody in charge to jury directing verdict reason for so doing *held* not reversible error, in action for cancellation of oil and gas lease.

**7. Appeal and error ⬦⇒1046(5)—Judge's remark on refusal to explain why he instructed verdict that he would not be caught in trap held nonprejudicial, in action to cancel lease.**

In action to cancel oil and gas lease, statement of trial judge, in answer to request that he give reason for instructing verdict, that he would not be caught in trap, *held* nonprejudicial.

Buck, J., dissenting.

Appeal from District Court, Clay County; Vincent Stine, Judge.

Action by J. H. Stine and others against the Oasis Oil Company. Judgment for defendant, and plaintiffs appeal. Affirmed.

Taylor, Muse & Taylor, of Wichita Falls, for appellants.

Kenley, Dawson & Holliday, Bonner, Bonner & Fryer, DeMontel & Sanford, and Weeks, Morrow, Francis & Hankerson, all of Wichita Falls, for appellee.

DUNKLIN, J. On September 27, 1923, J. H. Stine and others, who were joint owners of the fee-simple title to a tract of 816 acres of land situated in Clay county, executed an oil and gas lease thereon to James Cumley. The lease designated the owners of the land as party of the first part and the lessee as the second party. It recited a cash consideration paid of $10, and also contained the following stipulations:

"1. As a further consideration for an oil and gas lease and leasehold estate covering the above-described tract of land, second party does hereby bind and obligate himself to drill at his own cost and expense a well upon the above-described eight hundred sixteen acres of land to a depth of two thousand (2,000) feet, unless oil or gas is found in paying quantities at a lesser depth.

"2. Second party hereby agrees to commence operations for drilling of said well on or before 60 days from this date and to prosecute the drilling thereof with due diligence, care, and skill until the same shall have been fully drilled and completed to a depth of 2,000 feet, unless oil or gas is obtained in paying quantities at a lesser depth, and if oil or gas is obtained in paying quantities second party shall equip said well with the necessary machinery and equipment for the purpose of operating said well.

"3. In the event second party shall fail or refuse to commence operations for the drilling of said well on said premises within said 60 days from this date, then this lease shall terminate as to both parties and thereby automatically forfeited and of no further force and effect and said contract returned to first parties without recourse against second party.

"4. If drilling be done upon said leased premises by second party hereunder, then each well shall be drilled to a depth of 2,000 feet unless oil or gas is found in paying quantities at a lesser depth and failure so to drill shall forfeit all rights of second party hereunder, unless prevented therefrom by causes not reasonably within his control and when drilling is begun same shall be prosecuted and conducted with due diligence and it is expressly agreed that in the event drilling is done on said leased premises, should same at any time during the five year period cease for a period of ninety (90) days, this lease shall terminate as to both parties, except as to 10 acres, surrounding each oil well and 20 acres surrounding each gas well, unless second party shall on or before the expiration of said 90 days resume the payment of cash rentals in the amount and manner as hereinafter provided upon all acreage except 10 acres surrounding each oil well and 20 acres surrounding each gas well as aforesaid. And it is agreed that the resumption of the payment of rentals, as herein provided, shall not operate to defeat or affect this lease but same shall continue in force just as though there has been no cessation of drilling. The purpose of this paragraph is to require continuous drilling when once commenced, so that the cessation therefrom for 90 days during the five-year term

without resuming cash rentals and after the five year term in any event, is conclusively construed as abandonment and terminates the lease as aforesaid, but so long as drilling is continuous or cash rentals resumed, there can be no forfeiture.

"5. It is agreed that this lease shall remain in force for a term of five years from this date and as long thereafter as oil, gas, or either of them is produced from said lease by second party or his assigns.

"6. In consideration of the premises the said second party covenants and agrees:

"(a) To deliver to the credit of first parties free of cost, in the tanks or pipe lines to which he may connect his wells,. the equal one-eighth part of all oil produced and saved from the leased premises.

"(b) To pay to first parties the equal one-eighth part of the net proceeds received for the gas from each well.

"(c) To pay to first parties, or to first parties' credit in the W. B. Worsham & Co. Bank, in Henrietta, Tex., or its successors, which shall continue as the depository regardless of the changes in the ownership of said land, the sum of two dollars and fifty cents ($2.50) per acre per year, which shall operate as a rental and cover the privilege of deferring the drilling of additional wells as hereinabove provided. In like manner and ,upon like payments or tenders the drilling of additional wells may be further deferred for like periods of the same number. of months successively, not, however, beyond said five-year term.

"(d) In the event a dry hole be drilled on said land the rental herein specified shall not begin for a period of one year from the completion of said dry hole."

The lessors instituted this suit against the lessee and his assignees claiming under him to cancel the lease upon the claim that the defendants had forfeited all rights thereunder. It was alleged that within the time required by the lease a well was begun and finished to a depth of 1,775 feet, at which depth oil was discovered in paying quantities; that thereafter, and within the time required by the lease, defendants commenced and drilled five other wells, Nos. 2, 3, 4, and 5; that No. 2 was drilled to a depth of 1,790 feet; No. 3 to a depth of 1,875 feet, No. 4 to a depth of 1,950 feet, known as the Verschoyle well, No. 5 to a depth of 1,790 feet, and No. 6 to a depth of 1,803 feet; that all of said wells proved to be dry holes, and defendants abandoned further drilling thereof. It was further alleged that when the Verschoyle well reached a depth of 1,950 feet and struck salt water, plaintiffs agreed to release the defendants from any obligations to drill the same deeper. There were further allegations to the effect that all of said wells were begun within the times required by the .lease. But upon allegations that the defendants failed to drill wells Nos. 2, 3, 5, and 6, which proved to be dry holes, to a depth of 2,000 feet, a forfeiture of the lease was claimed as to the entire tract except 10 acres surrounding the first well.

Another ground of forfeiture claimed by plaintiffs consisted in allegations to the effect that the lease had been executed in triplicate originals and that the defendants had fraudulently altered the original, which had been delivered to them, in a material respect, which alteration rendered the entire lease null and void, or, at all events, to the entire tract save and except 10 acres surrounding the first well drilled, which was a producing well, and a like acreage surrounding the Verschoyle well. The alteration complained of consisted in the erasure of the word "each" and substituting therefor the word "the" before the word "well" in that portion of paragraph 4 of the lease, copied above, reading as follows:

"If drilling be done upon said leased premises by second party hereunder, then each well shall be drilled to a depth of 2,000 feet unless oil or gas is found in paying quantities at a lesser depth. * * *"

The case was tried before a jury, and at the conclusion of the evidence the court instructed the jury to return a verdict in favor of the defendants; and from a judgment in favor of the defendants, rendered upon a verdict returned in obedience to that instruction, the plaintiffs have prosecuted this appeal.

The testimony of F. Stine, one of the plaintiffs, who was a representative of all of plaintiffs in looking after the drilling operations, which testimony was introduced by them and which is uncontroverted, showed the following: Well No. 1 was a producing well and was finished on June 7, 1924, and has been producing oil in paying quantities ever since it was finished; well No. 2 was begun on July 17, 1924, and finished and abandoned as a dry hole at a depth of 1,790 feet on August 5, 1924; well No. 3 was begun July 25, 1924, and was completed to a depth of 1,882 feet on August 29, 1924, and then abandoned as a dry hole; well No. 4, the Verschoyle well, was begun July 28, 1924, and drilled to a depth of 1,951 feet and on September 14, 1924, abandoned as a dry hole by consent of the lessors; well No. 5 was begun December 24, 1924, and was finished as a dry hole at a depth of 1,790 feet on January 24, 1925; well No. 6 was begun on January 31, 1925, and finished as a dry hole at a depth of 1,803 feet on February 18, 1925.

[1-3] The suit was instituted March 12, 1925, one month and six days after well No. 6 was finished, and the testimony recited above, as well as plaintiffs' pleading, shows that drilling did not cease for a period of 90 days between the time well No. 1 was finished and accepted by plaintiffs as a producing well and the time the suit was filed. In view of those facts, the lessees were not required to pay rentals to ·keep the lease alive, but the same was kept in force by such drilling under the provisions of paragraph 4 of the lease copied above, and we believe that the drilling

so done by the lessees, within the meaning of paragraph 4 of the lease, was continuous from the time well No. 1 was finished until the date the suit was filed. It will be noted that while it was stipulated that each well should be drilled to a depth of 2,000 feet unless oil or gas was found at a lesser depth, and that failure to do so should forfeit the lease, unless prevented therefrom by causes not reasonably within the control of the lessee, and that drilling operations should be pursued with due diligence, yet there is no specific stipulation that after the drilling of such a well was begun it should continue until a depth of 2,000 feet was reached, and that in the event of failure to so continue drilling a forfeiture of the lease would result. It is well settled that a lessee, for the production of oil and gas, is under an implied obligation to pursue drilling operations with due diligence, and that obligation was also expressed in paragraph 4 of the lease. However, the plaintiffs' alleged right of forfeiture for noncompliance with the terms of the lease was based solely upon the terms of the lease and the evidence relied on to show a failure to drill wells Nos. 2, 3, 5, and 6 to a depth of 2,000 feet. There were no allegations in their petition that the failure to drill those wells to that depth was a failure to prosecute that work with diligence and that by reason thereof a forfeiture resulted. Nor were there allegations or proof that drilling to a depth of 2,000 feet was not prevented by causes not reasonably within the control of the lessee or his assignees.

If the first portion of paragraph 4 of the lease is to be construed as requiring each of the wells therein referred to to be drilled to a depth of 2,000 feet at all hazards, without cessation of drilling operations, and that a failure to fulfill that obligation would entitle plaintiffs to a forfeiture of the lease, then an ambiguity arises on the face of the lease, since that construction is at variance with the concluding language of the same paragraph, which reads:

"The purpose of this paragraph is to require continuous drilling when once commenced, so that the cessation therefrom for 90 days during the 5-year term without resuming cash rentals and after the 5-year term in any event, is conclusively construed as abandoning and terminates the lease as aforesaid, but so long as drilling is continuous or cash rentals resumed, there can be no forfeiture."

And that construction would be at further variance with paragraph 5 of the lease, which is as follows: "It is agreed that this lease shall remain in force for a term of five years from this date and as long thereafter as oil, gas, or either of them is produced from said lease by second party or his assigns"—since the proof showed that well No. 1 is still a producing well.

And a further ambiguity arises when subdivisions (c) and (d) of paragraph 6 are read in connection with paragraph 4; the proof showing that five dry holes were drilled, the last being finished February 18, 1925.

In Decker v. Kirlicks, 110 Tex. 90, 216 S. W. 385, the following was said by Chief Justice Phillips:

"If the provision is ambiguous, that alone condemns it as a forfeiture provision. A forfeiture should rest upon surer ground. Where a contract is so vague in its terms that a court cannot determine its meaning, it would be unjust to enforce a forfeiture under it against one whose only fault has been to possibly mistake its meaning. Forfeitures are harsh and punitive in their operation. They are not favored by the law, and ought not to be. The authority to forfeit a vested right or estate should not rest in provisions whose meaning is uncertain and obscure. It should be found only in language which is plain and clear—whose unequivocal character may render its exercise fair and rightful."

[4] Plaintiffs, having repudiated the lease and instituted suit to cancel it, were in no position to claim a forfeiture for failure to drill after such repudiation. Hodges v. Miller (Tex. Civ. App.) 244 S. W. 634, affirmed by the Supreme Court in Miller v. Hodges (Tex. Com. App.) 260 S. W. 168.

[5] It was alleged and the proof showed that one of the triplicate original leases that had been delivered to the lessee Cumley had been recorded in the deed records of Clay county, and that the same showed the word "the" had been substituted for the word "each" in that portion of the lease shown above, and by way of alternative relief plaintiffs prayed that that record be so corrected in that respect so as to be made to speak the truth.

Upon the trial James Cumley, the original lessee who had transferred the lease to the defendant L. W. Callendar, testified that the original lease which he received was never changed by him and that it contained the word "each" in place of the word "the" before the word "well" in paragraph 4 when he turned it over to his assignee, L. W. Callendar. Callendar's testimony was to the effect that he made no such change in the lease. The deputy clerk, who was in charge of the recording of such instrument, testified that it was her custom to compare all instruments after they were recorded and to correct any errors that might have been made in transcribing the original; that the lease in question was recorded in its regular course, and in her opinion that if an error had been made in the recording it would have been corrected, although she had no specific recollection of that particular instrument. The instrument which had been recorded was not introduced in evidence because, according to the testimony of defendants, it had been lost.

The defendants did not seek any relief or benefit under and by virtue of the error in the substitution of the word "the" for the word

290 S.W.—20

"each" in the recorded instrument; on the contrary, they elected to rely upon the terms of the lease as alleged in plaintiffs' petition and introduced in evidence.

In 1 Ruling Case Law, p. 1001, § 32, the following is said:

"If a lease is executed in duplicate, the landlord and tenant each retaining a copy, both copies are originals, and the fraudulent alteration by the tenant of the copy retained by him does not annul the lease, because the remaining copy is sufficient to sustain the contract between the parties. In such a case, of course, it might be said that the instrument in which the alteration is made is an altered instrument, but the contract, or the evidence thereof, is not affected, because of the fact that it is still evidenced by an unaltered instrument, that is, by the duplicate which was not altered."

See, also, 2 Corpus Juris, § 86, p. 1220, and authorities there cited; Stanley v. Epperson, 45 Tex. 644; Faulkner v. Feazel, 113 Ark. 289, 168 S. W. 568.

Under the rule announced in those authorities, even though it could be said, as alleged in plaintiffs' petition, that the original lease delivered to Cumley was altered in the manner alleged and with the fraudulent intent to gain advantage thereby, that fact would not be a ground for the cancellation sought by plaintiffs. Hence there was no reversible error in the failure of the court to submit that issue to the jury.

[6, 7] Nor was there reversible error in the refusal of the court to embody in his charge to the jury directing a verdict in the defendants' favor his reason for so doing, since we have been cited to no authorities and have found none requiring that to be done. The oral statement by the trial judge, when requested by the plaintiffs to give his reasons for instructing the verdict, to the effect that he would not be caught in a trap like that, was immaterial and harmless.

For the reasons stated, all assignments of error are overruled and the judgment is affirmed.

BUCK, J. (dissenting). This appeal is from an instructed verdict for defendants and a judgment thereon. In the drilling contract the lessee, Cumley, agreed to drill the wells to a depth of 2,000 feet unless oil or gas was obtained in paying quantities at a lesser depth. Well No. 1 was drilled to a depth of 1,775 feet and oil in paying quantities was found. Well No. 2 was drilled to a depth of 1,790 feet, well No. 3 to a depth of 1,875 feet, well No. 5 to a depth of 1,790 feet, and well No. 6 to a depth of 1,803 feet. Well No. 4 was drilled to a depth of 1,950 feet, and it is admitted by plaintiff in the testimony that F. Stine waived the sinking of this well to an additional depth of 50 feet. In effect, he does not rest his claim of forfeiture on a failure to drill No. 4 to a depth of 2,000 feet. It may be that the lessor, and perhaps the lessee, at the time they entered into the contract, believed, and had reason to believe, that it would be necessary to drill each well down to a depth of 2,000 feet in order to test thoroughly the land for oil sands; that in all probability there was an oil sand at a depth of approximately 2,000 feet. By the contractual agreement entered into by the lessor and lessee, the lessee agreed and stipulated that he would drill each well to a depth of 2,000 feet. None of the wells were drilled to that depth. It is a fact well known by oil men and drillers, and also known to the general public, that oftentimes there is a dip in the oil sands, so that one well, in order to reach the oil sands, must be drilled considerably deeper than another well on an adjoining tract which has produced oil in paying quantities. For instance, the old oil field of Spindle Top, as is currently known from newspaper reports and other information, was for a number of years practically abandoned because the wells drilled ceased to produce oil in paying quantities. But recently by going considerably deeper they have brought in a number of wells producing oil in paying quantities. Doubtless such an experience is true of many other oil fields in this state and in other oil states. It is true that defendants pleaded that the plaintiff had waived the drilling of the wells to a greater depth, but this the plaintiff denied in his pleadings and in his testimony. Callendar testified that it was discussed and understood between him and Stine that the first well was to be drilled to a depth of 2,000 feet unless oil or gas was encountered at a lesser depth, and that Stine agreed that it would be absurd, after the completion of the first well, which produced oil in paying quantities, that the other wells should be drilled to a depth of 2,000 feet. There is further evidence to the effect that Stine did not complain of the failure to drill four of the subsequent wells to a depth of 2,000 feet, and that by his course of conduct it might reasonably be claimed he practically waived such stipulation. But he testified that the drillers would not tell him how deep the wells were being drilled, and that he did not know until he had gotten the logs of the wells from the office of the railroad commission, whose duty it is to exercise supervision over the drilling of oil and gas wells.

The writer thinks it is probable that if the question of waiver had been submitted to the jury, that the jury would have found that the lessor had waived the drilling to 2,000 feet of the four wells, and that the evidence would have been sufficient to sustain such finding. But in view of the conflict of testimony on this point, the writer does not think that the court was authorized to render a judgment upon a peremptory instruction to that effect. The writer is well acquainted with the line of authorities, some of which are quoted from in the majority opinion, such as Decker v.

Kirlicks, 110 Tex. 90, 216 S. W. 385, and is also aware of the holding of the authorities that a forfeiture is a harsh remedy, and not favored by law, and should not be enforced or sustained unless fully supported by the evidence. But he does not think that in this case the evidence justifies the trial court in instructing a verdict for the defendant. Therefore, briefly, because of the pressure of other official business, the writer respectively dissents from the conclusion of the majority on this point.