BRADLEY *v.* HOLLIMAN.

Opinion delivered February 25, 1918.

LEASES—LESSEE'S COVENANT TO REPAIR—DAMAGE CAUSED BY FLOOD—MINING PROPERTY.—Where a lessee covenants to keep the leased premises in repair, and there is no exception in the contract against accident by flood, the lessee will be required, under the lease, to repair damages occasioned by a flood.

Appeal from Searcy Chancery Court; *Ben F. McMahan,* Chancellor; reversed.

*Williams & Seawel,* for appellants; *J. F. Henley,* of counsel.

I. Bradley's title can not be disputed by Rambo or his assignees. 54 Ark. 460; 84 *Id.* 220; 104 *Id.* 322.

Rambo was not financially able to operate the property. He made false representation of material facts. 38 Ark. 334; 46 *Id.* 245; 60 *Id.* 281; *Ib.* 387; 74 *Id.* 46. His contract was forfeited. 97 Ark. 167; 2 Cyc. 705.

(1) This was a chancery case and will be tried here *de novo.* 43 Ark. 451; 62 *Id.* 262; 75 *Id.* 181; 76 *Id.* 551; 88 *Id.* 363; 114 *Id.* 316.

(2) Rambo could not hold for speculative purposes, and it was his duty to surrender possession when he could not successfully operate the mine. 97 Ark. 167. Holliman was in no better attitude.

(3) Rambo did not show good faith in assigning to Holliman. He failed because of inability to raise funds. Notice of cancellation was given. Nor had Holliman the funds.

(4) It was error to render damages against Bradley, and the court erred in its measure.

II. The decree is against the great preponderance of the evidence. The record title is in appellants. Kirby's Digest, § 2967. Bradley had no authority to make the contract with Rambo, and it was never ratified. The answer shifted the burden to appellee. 36 Ark. 518; 68 *Id.* 376; 32 *Id.* 593; 4 Enc. Dig. Ark. Rep. 262.

Bradley had no right to sell or lease the mine. Both cases should be reversed.

*A. Y. Barr,* for appellee; *W. F. Reeves,* of counsel.

1. No bill of exceptions was filed nor motion for new trial. 93 Ark. 84; *Ib.* 85; 111 *Id.* 468; 93 *Id.* 382; 95 *Id.* 62; 69 *Id.* 23; 38 *Id.* 477; 80 *Id.* 579; 93 *Id.* 394.

2. The case should be affirmed upon the evidence, as there is no error of law. No fraud was shown in procuring the lease and Rambo had the right to assign the lease. The evidence supports the findings of the court. 67 Ark. 285; 68 *Id.* 134, 314; 58 *Id.* 135; 63 *Id.* 513; 64 *Id.* 609.

3. Damages against Bradley were properly awarded. No forfeiture of lease was shown. Bradley had an interest and his tenant or lessee can not be ejected.

### STATEMENT OF FACTS.

These actions were instituted, the one in unlawful detainer, the other in ejectment to recover the possession of certain mining lands in Searcy County, Arkansas, known as the "Jack Pot" mining property. The owners of the property are W. M. Robb, T. A. Chichester, W. A. Montgomery, John Coker, T. H. Barrett, E. O. Meade, John B. Stone. After the issues were made up the causes were consolidated and transferred to the chancery court and proceeded to trial there without objection to the jurisdiction.

On the 6th of January, 1913, W. M. Robb, T. H. Chichester, B. H. Montgomery and W. A. Montgomery signed the following instrument: "This authorizes C. L. Bradley to represent our interest in the Jack Pot mine located in Searcy County, Arkansas, fully authorizing him to collect any moneys due the owners from whatever

source and to take possession of said mine if in his judgment our interest demands such procedure.''

On the 12th of March, 1915, C. L. Bradley and E. J. Rambo entered into the following contract:

"Shreveport, La., March 12, 1915.

"Memorandum of a contract entered into this twelfth day of March, 1915, by and between C. L. Bradley, of the first part, and E. J. Rambo, of the second part, witnesseth:

"First. That C. L. Bradley of the first part agrees to deliver to E. J. Rambo of the second part in sixty days from this date a ten-year lease on the Jack Pot zinc mine, located in Searcy County, Arkansas, on the following terms and conditions:

"First. E. J. Rambo or his assigns agrees to pay to C. L. Bradley ten (10) per cent. of the marketable product of the said mine or the value thereof in cash whenever any of the product is sold.

"Second. E. J. Rambo or his assigns agrees to operate the mine continuously, keeping the machinery in as good working order as when he takes possession ten days hence, less the natural wear and tear of same.

"Third. Should E. J. Rambo of the second part or his assigns fail to operate the above mentioned mine for sixty days without the written consent of C. L. Bradley or the other owners of said mine, then this lease becomes null and void.

"Fourth. It is further agreed that should the party of the second part wish to renew this lease at its expiration the party of the first agrees to renew it on the same terms and time as above mentioned in this lease."

Rambo took possession of the property and assigned an interest therein to one P. T. Alexander, and also a short time thereafter assigned an interest therein to H. Muslow and H. J. Pitt, Rambo remaining in possession of the property.

The plaintiffs in their complaints set up that Rambo and his assignees had failed to perform the contract and alleged that the same on account of such failure had been

forfeited. They also set up that Bradley had no authority to execute the contract.

The appellees set up in their answer and cross-complaint that the contract had been fully performed on their part, and alleged that after Bradley had executed the contract with Rambo his acts were communicated to the owners and that they ratified the contract and the acts of Bradley under it. They set up that they had expended as much as $2,000 in developing the lands and in performing their contract and asked that the owners be required to execute a lease in accordance with the Bradley contract.

The proof on the part of the appellants tended to show that at the time the contract between Bradley and Rambo was entered into, Rambo represented that he had about $5,000 and was amply able to operate the property and carry on the mine successfully. When this contract was entered into a great deal of the development work had already been done in the opening up of the ground and in constructing a mill plant at an expense of approximately $20,000 .

Some time in June Bradley visited the property and Rambo up to that time had put some posts under the mill where they had rotted out, and that was about the extent of the work that showed. Rambo told Bradley that he had not mined any up to that time, and Rambo had never paid any royalties.

On August 22, 1915, Rambo wrote Bradley reciting what he had been doing, stating among other things that he had been getting out stuff ready to mill for two weeks and at the same time getting enough milling stuff to run the mill over half of the time. After stating what he had done, he then tells about the big flood that had occurred which caused the Buffalo river to rise sixty-three feet. In this letter he enumerates the items of damage that were caused by the flood. The letter shows that the mill plant and practically all of the machinery had been washed away or damaged, leaving the crusher and one

set of rolls as the only machinery uninjured. The letter then proceeds as follows: "Everything looked good when I came here, but when put to the test a weakness developed that had to be strengthened until it seemed to me that I had to almost rebuild the mill. Now I would like to sell the lease, and if you will send or help me find a buyer I would feel under the greatest obligations to you. This property can be made to pay and pay well if properly mined, but I can't raise the funds in a short time to rebuild it. Would like to get enough for it to partially repay what it has cost."

In another letter from Rambo to Bradley, September 10, 1915, Rambo among other things states: "I am try- ing to get parties interested in the lease that will build the mill and put the other buildings back just as they were before the flood. I find that it is an uphill business to find a crowd that has enough red sporting blood in their veins to take the chance of a flood for twenty years, but I think I have finally gotten some men together that will invest in the enterprise. If they stick, I wish you would extend the time for nonmining for sixty days. * * * The time ex- pires on the 12th of October, if I remember right."

In a letter dated September 27, 1915, he recites among other things: "Your failing to grant an exten- sion of time to suspend mining while rebuilding the plant throws such a wet blanket on the whole business as to block the game. By the terms of the lease it becomes void on the 18th of October, as the last work done at the time was the 19th of August. It is useless for me to try to find a man to rebuild the plant without you give me time to do it. I am negotiating with two other parties that I could close a deal with and have the mill rebuilt if given time enough."

It was shown on behalf of the appellant that as late as November, when the actions were instituted there had been no attempt on the part of Rambo or his assignees to rebuild the mill or even put the machinery, that had been gathered up, out of the weather. During all this time if

Rambo or his assignees produced any ore they never paid any royalty.

Rambo testified on behalf of the appellees and after recounting the difficulties that he had encountered soon after entering upon the performance of the contract, he recited in detail what he had done, and stated that in addition to his own time that he had spent about $950 in development work. He stated that he had not remained idle for sixty days during the time that he held the lease, unless when he was prevented by Providence. The big flood that washed the mill away occurred on the night of the 19th of August. It was an unusual flood, the water rose twenty-five feet higher than it had ever been known to do before. He stated that he had more than enough means to operate the mine if it had been as he thought it was and as Bradley had represented it to be.

James Holliman testified on behalf of the appellees that, as one of the assignees of E. J. Rambo, he had charge of the property in controversy on October 12, 1915, and worked continuously thereafter until dispossessed by this suit, except for about three or four days. When he took charge of the property, the mill was in bad shape. The flood had washed the mill away, or principally all of it, and the remainder of everything that could be handily gotten to was carried back by Mr. Rambo and restored to the mill in the safest place that he could get it.

His testimony shows that he went to work getting out free ore and had cleaned up about six tons. He had expended about $225 to $250 for labor, gathering up machinery, and repairing the mill. He had arrangements made at the time that he was ousted to continue the operation of the property. He was asked if he would have reconstructed the mill and put it in operation under the arrangements that he had. He answered that he thought he could or he would not have secured the lease. His testimony tended further to show that a considerable ore body lying in blanket form had been uncovered. It was in the opinion of the witness a permanent ore body. His

plan was to put on a double shift, and he figured that when he had opened up the ground sufficiently he could put out a car load of free ore every two weeks. There was other testimony on behalf of the appellees tending to corroborate the testimony of Holliman as to the ore body, and tending to show that Holliman had made arrangements with a working crew to stay and work in the development of the mine.

The court found that, at the time of the filing of the actions, Rambo and his assignees had substantially complied with the terms of the contract and were wrongfully dispossessed of the property; that the owners were not entitled to recover possession of the land; and entered judgment dismissing the complaints.

WOOD, J., (after stating the facts). The cause was heard upon testimony taken *ore tenus* before the court and taken down by a stenographer and afterwards reduced to writing, the statements made a part of the record and treated as depositions taken in the regular way. A motion for a new trial and bill of exceptions were therefore not necessary to present to this court the issues of fact that were passed upon by the trial court. *LeMay v. Johnson*, 35 Ark. 225; *Western Coal & Mining Co.* v. *Hollenbeck*, 72 Ark. 44. See also Acts 1915, page 1081.

Chancery causes in this court are heard *de novo*.

Passing over the question as to whether or not C. L. Bradley had authority to enter into the contract with Rambo under which appellees claim, and conceding that he had such authority, nevertheless the court erred in holding that Rambo and his assignees had complied with the terms of the contract.

The undisputed evidence shows that at the time the contract was entered into Rambo represented to Bradley that he was financially able to perform the contract. Without setting out and discussing the evidence in detail, we are convinced that the decided preponderance of it shows that Rambo was not financially able to perform the contract, and did not operate the mine continuously as

contemplated by the contract. Furthermore, even if Rambo and his assignees had performed the contract up to the time when the big flood came that washed away the buildings and most of the machinery, thus making it impossible to operate the mill plant until same was restored, there was no effort on the part of Rambo or his assignees to rehabilitate the plant. The undisputed facts as shown by the letters of Rambo to Bradley and as shown by the testimony of Holliman are that at the time the lease was canceled they had made no efforts towards the rebuilding of the plant. Holliman testified on this point, ''after the mill washed away it lay idle until I went to work October 12.'' He was asked if he had any money with which to begin operations when he purchased an interest, and answered: ''But very little. I had a little; I don't think over $50 or $75. I have an idea that a mill like that would cost about $7,500 or $8,000. I had a chance to make the ore build it back or get money and build it back if necessary. Mr. Muslow informed me by letter that he would assist me in getting the mill back if I could not work my way through on the free ore proposition. I insisted on trying that first. I had not made arrangements further than this; was relying on what he told me; I suppose that this was the only arrangements made about it.''

After Rambo wrote Bradley stating that he could not raise the funds to rebuild the mill and that he wished to sell the lease, Bradley gave notice to Rambo to quit and that the lease contract was canceled. Holliman knew that such notice had been given to Rambo at the time that he purchased the interest in the lease from Rambo.

The clear preponderance of the evidence shows that neither Rambo nor Holliman had the means to rebuild the mill plant after the same had been washed away by the great flood of August 19, nor had they made it appear that any one else had agreed to furnish them the money with which to restore the plant. The burden was upon the appellees to show that they intended to rebuild and could have restored the *status quo* of the property within a reasonable time after its destruction by the flood. There

was an express covenant on the part of appellee Rambo, "to keep the machinery in as good working order as when he took possession, less the natural wear and tear of the same."

"Under an express covenant to repair, the lessee's liability is not confined to cases of ordinary and gradual decay, but extends to injuries done to the property by fire, although accidental; and even if the premises are entirely consumed, he is still bound to repair within a reasonable time. And the principle applies to all damages occasioned by a public enemy, or by a mob, flood or tempest. Thus where the covenant is 'to repair' in general terms, or 'to repair, uphold and support,' or however otherwise phrased, if it prescribes the duty of repair, it binds the lessee to rebuild if the premises are destroyed." 1 Taylor's Landlord & Tenant, § 364, p. 454. See cases cited in note. See *Tedstrom* v. *Puddephatt*, 99 Ark. 193.

There was no exception in the contract against accident by flood, therefore the appellee Rambo and his assignees are bound by the express covenant to repair.

A clear preponderance of the evidence shows that after the mill plant was swept away by the flood appellees were holding the same for speculative purposes. The most that the proof shows is that they hoped to be able to make the necessary financial arrangements to rebuild the plant. But they had not succeeded and had abandoned all efforts in this direction except trying to make the production of free ore pay the expenses of development. This the evidence shows was entirely problematical. The appellants under the circumstances had a right to treat the lease as canceled and to take possession of the property.

The decree of the court is therefore reversed and the cause is remanded with directions to the chancery court to enter decree in accordance with this opinion.