RAINS COAL CORPORATION *v.* SOUTHERN COAL COMPANY, INC.

4-6452                         155 S. W. 2d 348

Opinion delivered November 3, 1941.

*R. A. Young, Jr.,* and *Harper & Harper,* for appellant.

*Warner & Warner,* for appellee.

HOLT, J. July 5, 1940, appellee, Southern Coal Company, Inc., brought suit against Arthur L. Rains, Rains Coal Corporation and Ben H. Bedwell, appellants, to cancel a coal mining lease contract and for possession of the property described in the lease. The lease contract is made a part of the complaint. As grounds for cancellation and possession of the leased property, the complaint alleged, among other things, the insolvency of the lessees; that they had abandoned the property; and had committed waste and had breached the terms of the lease contract. A demurrer by the defendants below to the complaint was overruled. They then answered denying every material allegation in the complaint and alleged that appellee had breached the terms of the lease contract thereby preventing continued performance thereof by the lessees. Along with the answer, the lessees (defendants below) filed a ''counterclaim'' against appellee in which a large sum was sought as damages.

Upon a trial the chancellor found the issues in favor of appellee (plaintiff below) and quoting from the decree:

''The court further finds that on September 30, 1939, plaintiff entered into a written lease contract with the defendant, Arthur L. Rains, whereby it leased to him the mining property and equipment described in said lease contract and the inventory attached thereto; that said lease was transferred and assigned to said Rains Coal Corporation, and said property was used by it in operating its mine until February 15, 1940, when it ceased operations; that said defendant was insolvent and that it abandoned said lease and property, and forfeited said contract; that plaintiff is entitled to the cancellation of said lease and to immediate possession of all property therein described, and to the relief prayed against the said defendant, Rains Coal Corporation.

''The court further finds that the defendant, Arthur L. Rains and Ben H. Bedwell, have no right, title, claim, interest or equity in or to said lease, or the property therein described and that they are not personally interested therein, and that the complaint should be dismissed as to them.''

Accordingly the lease contract in question was ordered canceled and all rights thereunder of the lessees annulled. It was decreed that appellee (plaintiff below) be given immediate possession of the leased property and that the complaint be dismissed as to Arthur L. Rains and Ben H. Bedwell. From this decree appellant, Rains Coal Corporation, has appealed.

Under the terms of the lease contract appellee, as lessor, leased to Arthur L. Rains all the mining machinery, equipment, and appurtenances, tracks and tipple situated on the land in Sebastian county, Arkansas, described in the lease for a term of three years. This lease was assigned to appellant by Arthur L. Rains.

The lease provides, among other things, that the property was leased to appellant "for the purpose of using the same in mining and removing the coal lying underneath said described premises and such adjoining lands as the lessee may hereafter acquire, by lease or otherwise, upon the conditions hereinafter stated . . .;" that the lessee pay for the use of the leased property twenty-five cents per ton for all coal removed from the premises and adjoining lands and a minimum annual royalty of not less than $2,500 for the first year and $3,750 for the remaining two years of the lease term.

The lease further provided "that if at any time the said lessee, or the corporation to be organized by him, shall become insolvent, or if waste be committed, or if said leased property, or any part thereof, is attached, seized or levied upon, then, in any or either event, the said lessor shall be entitled to immediately terminate this lease. . . . Said lessee further agrees to procure and maintain at his sole expense insurance against loss and damage by fire and tornado on said leased property in one or more reliable insurance companies to be approved by lessor, in the sum of ten thousand ($10,000) dollars, with loss payable clause in favor of said lessor."

The lease further provided: "Upon the expiration or termination of this lease, said lessee agrees to surrender and deliver up to the lessor the possession of said property in as good condition as the same is now in, ordinary wear and tear excepted. . . . Said lessee cove-

nants and agrees to take good care of all of said leased property and to make all necessary and proper repairs and replacements thereto, and to at all times preserve and protect all said machinery, equipment, appliances and appurtenances situated in said mine, and that all such repairs and replacements as shall be necessary on said property, shall be made at the sole cost and expense of said lessee.''

It is also provided that if lessee ''fails to keep and perform any or all of the covenants and agreements herein specified upon his part to be kept and performed, then said lessor shall be entitled to give said lessee thirty days' notice in writing of such default, and in the event the said lessee fails to fully comply with and perform all such requirements of said lease within said period, the said lessor shall thereupon be entitled to immediately declare this lease forfeited.

There was a further provision that the lessee should not allow the water in the mine to rise above the third east entry, nor waste to be committed.

It is undisputed that appellant operated the mine under the lease agreement until February 15, 1940, or for a period of approximately five months. November, 1939, mining operations in the mine broke into an adjoining abandoned mine from which large quantities of water flowed into the leased mine, causing the death of four employees of appellant. February 15, 1940, suits were brought against appellant claiming total damages as a result of these deaths in the amount of $140,000. Garnishments were immediately served on the Farmers Bank at Greenwood, the Frisco Railroad and appellee, and the funds and property of appellant were impounded to apply on these death claims. Following the filing of the above damage claims and the impounding of appellant's funds, appellant, Rains Coal Corporation, filed a voluntary petition in bankruptcy and it was adjudged a bankrupt on February 26, 1940. It filed its verified schedule of assets and liabilities, listing debts of $154,795.53 and assets, $12,712.47. The listed debts, other than the death claims, amount to $14,795.53, or $2,083.06 in excess of all

assets. The four death claims were settled for a total of $3,000.

After mining operations ceased on February 15, 1940, water began to accumulate in the mine and while appellee at its own expense pumped water from the mine for a short time, no pumping has been done since the latter part of February, 1940.

In March, 1940, Mr. Rains, who was president of the Rains Coal Corporation, appellant, and in charge of its mining operations, according to the great preponderance of the testimony as reflected by this record, abandoned the leased property and accepted employment with the Bates Coal Company at Bates, Arkansas, and has since been employed by that company. The bankruptcy proceedings were terminated the latter part of March, 1940, and according to the testimony of Rains, after an adjustment with appellant's creditors, except for the four death claims amounting to $3,000, all property of appellant, except its lease, was "wiped out completely," leaving it "flat broke." He further testified that after he left the leased property the mine filled with water.

On April 27, 1940, the tipple and the boiler house of the mine were destroyed by fire. This was after appellant had abandoned the property. Insurance in the amount of $6,200 was paid to appellee for this loss. The insurance covering the tipple and boiler house carried by appellant and effective during the time appellant operated the mine, had been canceled in March, 1940, and other insurance had been acquired by appellee at its own expense.

The mining lease in question had first been acquired by Arthur L. Rains from Edward Abrams. As has been indicated, Rains assigned this lease to appellant corporation, of which he was president. The record reflects that Rains paid nothing for the lease from Abrams, although at the trial in the instant case he valued the lease at $40,000. It had been previously owned by the Midland Coal Company, which had gone into bankruptcy and its property sold on June 12, 1939. Said lease, however, was not sold, but was surrendered to the owner of the land (Abrams). When appellant corporation became

bankrupt in February, 1940, Mr. Rains' verified valuation of all the assets and property of appellant corporation was $12,712.47. Clearly at that time he considered the lease of no value. Appellant's creditors were entitled to all of its assets of any value and according to the testimony of Rains himself, they got these assets. The chancellor found on what we think to be the great preponderance of the testimony that appellant had breached the plain terms of the lease contract by becoming insolvent and unable to perform under its terms and by abandoning the property and committing waste. The lease contract specifically stipulates "that if at any time the said lessee, or the corporation to be organized by him, shall become insolvent or if waste be committed . . . lessor shall be entitled to immediately terminate this lease." It is difficult to understand how insolvency, abandonment and waste could be more clearly established than under the evidence before us.

In the bankruptcy proceedings of February, 1940, Mr. Rains, in a verified, itemized statement of appellant's assets, shows them to be less than its debts by $2,083.06 and he frankly admits that the company was "flat broke," "wiped out," and, of course, unable to carry on. This does not take into account the $3,000 in death claims which appellant owed. Not only this, but the preponderance of the testimony shows that Rains abandoned the property and secured employment elsewhere and allowed the mine to fill with water. After leaving the property, the tipple and boiler house burned. In the circumstances here the thirty days' notice provision set out in the contract does not apply and appellant was not entitled to such notice since the lease was terminated and forfeited and appellee had the right to enter and take possession *immediately* upon the insolvency, abandonment or the commission of waste. *Munson* v. *Baldwin,* 88 Wash. 379, 153 Pac. 338.

Clearly appellant was unable to carry on operations because it was without the ability to perform. The lease required lessee "to begin and to continue the work of development," and the rental to be paid lessor for the property depended upon the development of the mine,

lessor receiving "a percentage of the output from development." This, we think, made it a lease for mining purposes.

The lease contract provides "that the relationship between the parties hereto being solely that of lessor and lessee" . . . "And the said lessee hereby accepts the foregoing grant and leases said described property for the purpose of using the same in mining and removing the coal lying underneath said described premises and such adjoining lands as the lessee may hereafter acquire, by lease or otherwise, upon the conditions hereinafter stated, with all and each of which he agrees to comply and be bound . . ."

We think the lease here was in form and effect a mining lease for mining purposes similar to that under consideration by this court in *Millar* v. *Mauney*, 150 Ark. 161, 234 S. W. 498. There it is said:

". . . As compensation for the use of his land for such purposes, the lessor receives by way of rental or royalty a certain percentage of the output from the development of the leased property. In other words, this is strictly a lease for 'mining purposes,' such as was under consideration by this court in the case of *Mansfield Gas Co.* v. *Alexander*, 97 Ark. 167, 133 S. W. 837. In that case we said:

" 'In the construction of mineral leases such as is involved in this case, the authorities uniformly hold that there is an implied obligation on the part of the lessee to proceed with the search and also with the development of the land with reasonable diligence according to the usual course of such business, and that a failure to do so amounts in effect to an abandonment and works a forfeiture of the lease.' And further: 'According to the uniform holding of the authorities, the law will read into this lease a covenant on the part of the lessee that it will with due and proper diligence search the land described in the lease for minerals and with due and proper diligence develop the same. This implied covenant is in effect a condition upon which the lease was made; a failure or refusal to perform that condition results in a forfeiture of the lease.'

". . . Although the above doctrine was enunciated in suits in chancery to cancel the lease, it is equally applicable in actions at law to recover the possession of the property if there has been such a failure on the part of the lessees, still in possession, to observe the covenants by which they are bound as to be tantamount to an abandonment of those covenants and a consequent forfeiture of all their rights under the contract. If the conduct of the lessees in contracts of this nature is such as to show that they do not intend in good faith to perform the covenants by which they are bound, then they have, in legal effect, rescinded those covenants and released the lessors from the obligations of the contract, and the latter are justified likewise in treating the contract as rescinded.

. . .

". . . Unless it is otherwise provided in the lease, it is always in the contemplation of the parties to such a contract that the lessee is able, financially and in every other way, to perform his undertakings in the time and manner specified in the contract. If, after a reasonable time, he fails to begin and to continue the work of development and exploration provided in the contract, but nevertheless holds possession and exercises control over the leased lands for promotion purposes or financial exploitations, he has by such conduct worked a forfeiture of his rights under the lease and may thereafter be treated as having abandoned his contract and as holding the land as a trespasser adversely to the lessor. . . .

"The good intentions of the lessee in such contracts to perform the same will not avail him unless he also has the ability to perform, and actually does perform the covenants of his contract within a reasonable time. To abandon means to quit; usually the voluntary relinquishment of a right or privilege which one enjoys. But in cases like this the lessee will be held to have abandoned his right or privilege if he, without fault on the part of the lessor, is unable after a reasonable time to perform the covenants of his lease. Abandonment is ordinarily a mixed question of law and fact."

We think the principles of law announced in the Millar case apply here.

Here, as we have indicated, the lease was one for mining purposes since appellee's compensation depended upon the quantity of coal mined by the lessee and the lessee was obligated to carry on operations with reasonable diligence and (as said in the Millar case) "a failure to do so amounts in effect to an abandonment and works a forfeiture of the lease." Here appellant could not continue performance under the lease on account of insolvency, abandonment and waste, as has been indicated.

Appellant also urges here that under the lease contract it was the duty of appellee to rebuild the tipple and boiler house and that its failure so to do prevented appellant's further operation of the mine and resulted in great damage to appellant. We cannot agree with this construction of the lease contract.

It will be observed that under the plain terms of this lease the lessee (appellant here) agreed to take good care of all of said leased property, and to make all necessary repairs and replacements at its sole cost and expense. This placed the duty on the lessee to rebuild the tipple at its own expense. Courts cannot make contracts for parties, but must construe and enforce them as written.

In *St. L., S. W. Ry. Co.* v. *Cook-Bahlau Co.,* 187 Ark. 106, 58 S. W. 2d 428, this court said: "The courts do not make contracts for the parties but only construe them. The parties having made this contract in clear and unambiguous language, it is the duty of the court to construe it according to the plain meaning of the language employed, and not to enlarge or extend its terms on any theory. . . ." See, also, *Brotherhood Ry. Tr.* v. *Deaton,* 175 Ark. 733, 1 S. W. 2d 51.

In *Bradley* v. *Holliman,* 134 Ark. 588, 202 S. W. 469, Bradley leased a zinc mine to Rambo for ten years. During the life of the lease the mine plant and most of the machinery was damaged or washed away and in considering the effect of the provisions of the lease agreement, this court said:

"There was an express covenant on the part of appellee Rambo, 'to keep the machinery in as good work-

ing order 'as when he took possession, less the natural wear and tear of the same.'

" 'Under an express covenant to repair, the lessee's liability is not confined to cases of ordinary and gradual decay, but extends to injuries done to the property by fire, although accidental; and even if the premises are entirely consumed, he is still bound to repair within a reasonable time. And the principle applies to all damages occasioned by a public enemy, or by a mob, flood or tempest. Thus, where the covenant is to "repair" in general terms, or "to repair, uphold and support," or however otherwise phrased, if it prescribes the duty of repair, it binds the lessee to rebuild if the premises are destroyed.' 1 Taylor's Landlord & Tenant, § 364, p. 454. See cases cited in note, and *Tedstrom* v. *Puddephatt*, 99 Ark. 193, 137 S. W. 816, Ann. Cas. 1913A, 1092.

"There was no exception in the contract against accident by flood, therefore, the appellee, Rambo, and his assignees are bound by the express covenant to repair."

Appellant further contends that appellee made a verbal agreement, after the lease was executed, that the proceeds of the fire insurance should be used to replace property destroyed by fire. As we have indicated, the lease contract here which is complete in itself contains no such provision, and any parol testimony tending to vary the plain terms of the contract would be incompetent for the reason that you cannot add to or take from written contracts by parol evidence.

In *Lawrence* v. *Mahoney*, 145 Ark. 310, 225 S. W. 340, this court said: "It is well settled that parties cannot add to or vary the terms of a written contract by parol evidence. It is manifest that, if the lessor should be allowed to go to trial and prove this allegation of the complaint, that would impose obligations in the contract which are not now recited in the written instrument. The written instrument is complete in itself and embodies the last expression of the parties with regard to the matters contained therein."

And in *Bloch* v. *Tucker*, 107 Ark. 349, 154 S. W. 1140, this court said: "The contract did not contain a covenant on the part of the landlord to repair the premises,

nor did it contain a warranty of the condition of the roof. Any attempt to engraft a warranty upon the written contract of lease would vary its terms and is, therefore, not permissible, under the rule of evidence. *Delaney* v. *Jackson,* 95 Ark. 131, 128 S. W. 859; *Maxfield* v. *Jones,* 106 Ark. 346, 153 S. W. 584.''

In view of our conclusions as expressed above, it follows that appellant is not entitled to recover on its counterclaim.

Finding no error in this record, the decree is affirmed.