Winn *v.* Collins.

4-7461—4-7474                      183 S. W. 2d 593

Opinion delivered November 20, 1944.

*Sherrill, Cockrill & Wills,* for appellant.

*Verne McMillen* and *Henderson, Meek, Catlett & Henderson,* for appellee.

McFADDIN, J.   There are two cases in this Court of the same style, being No. 7474 and No. 7461. Both arise from the same transaction. We dispose of them separately.

### No. 7474

On January 29, 1943, C. R. Winn and Maurine Winn, his wife, as lessors, executed a mineral lease to W. A. Collins, as lessee, which lease, omitting only the identification of the parties, the relinquishment of dower and homestead, the signatures, and the acknowledgment, is as follows:

"That the said Lessor, for and in consideration of the sum of ONE DOLLAR, cash in hand paid by the said lessee, the receipt of which is hereby acknowledged, and the further covenants and agreements herein contained to be performed, kept, and paid by the said lessee, lessor does by these presents, demise, let and lease unto the said lessee, for the sole purpose of prospecting for, mining upon and operating thereon for bauxite, and for the building of temporary and permanent structures thereon to produce, save, care for and market bauxite, all that certain tract of land situated in the county of Pulaski and State of Arkansas, to-wit: Southwest ¼ of the northwest ¼ in section 9 township 1 south, range 12 west and containing 40 acres, more or less.

"It is agreed that this lease shall remain in full force and effect for a period of 30 days from the date hereof thus determining its marketability, and at the

expiration of the first 30 day period, then lessee shall have an additional 60 days in which to begin active mining operations on the said lands.

"If within 90 days from the date of this lease no active mining operations shall have been begun on this lease, then this lease shall be void in all of its terms and all rights granted herein shall revert to the lessor herein. However if active mining operations shall have been begun within the said 90 days from the date of this lease, then this lease shall be and remain in full force and effect so long as active mining operations are conducted therein, with this provision, that a minimum tonnage of 12,000 tons per annum is removed from said lands annually. This lease shall continue in full force and effect until the merchantable bauxite is removed therefrom.

"In consideration of the premises herein contained the said lessee covenants and agrees to deliver to the lessor, free of cost the sum of 50c per long ton of dry bauxite mined and removed from the land as royalty. This royalty shall be paid to the lessor in person, or as the lessee shall direct in writing, on or before the 10th day of each month following production.

"If lessor owns a less interest in said lands than the entire fee simple title, then royalties shall be paid to lessor in proportion to the interest lessor owns bears to the entire fee simple title.

"Lessee shall have the free and unrestricted right to ingress and egress to said lands.

"Lessee shall not be liable for any damages, water damages, excavation damages, gangue pile damages, water flow damages or any other damage done to said lands by his operations thereon.

"Lessee shall, at all times, have the right to remove any buildings, structures, equipment, machinery, or properties placed on said lands by lessee in the conduct of his operations thereon.

"The rights of assignment is expressly reserved to both lessor and lessee, as their respective right may ap-

pear and such right of assignment shall extend to their heirs, representatives, administrators, and assigns.

"No change in the ownership of said lands shall be binding upon lessee in the payment of royalties unless written notice of such change of ownership shall be given lessee at least thirty days prior to the due date of any such royalty payment.

"The intention of this lease is that the lessee shall begin active mining operation on said lease within 90 days from the date hereof and shall continue such operations in a workmanlike and business manner until such bauxite deposits is exhausted, or as long as bauxite can be mined and marketed at a profit to the lessee.

"Lessor hereby agrees to warrant and defend the title to said lands against all lawful claims whatever."

By mesne assignments the Aluminite Mining Corporation and Pioneer Construction Company became the assignees and owners of the lease, and are the real parties in interest, and the appellees in this court.

The appellants, C. R. and Maurine Winn, on January 31, 1944, filed suit in the Pulaski chancery court, praying that the lease be canceled and forfeited, and alleged: (1) that appellees had failed to fulfill the sixty-day provision in the lease as to beginning active mining operations; (2) that the appellees had failed to market from the land the minimum tonnage of 12,000 tons per annum within the year ending January 28, 1944; and (3) that appellees had failed to continue work on the premises in a workmanlike and business manner, and had failed to properly develop the premises.

Appellees denied all allegations in the complaint, alleged expenditure of over $100,000 in the mining operations on appellants' land, and claimed that appellants "by their general non-cooperative attitude (and particularly by placing restrictions upon the piling of spoil dirt)," had retarded the mining operations.

At the trial on April 25, 1944, it was shown that on November 10, 1943, appellants had received $50 as roy-

alty on bauxite mined from the land. A further tender of $5,950 was made by appellees in open court, and rejected by the appellants for three reasons stated by appellants' counsel: (a) the lease did not provide for payment of royalty in lieu of development; (b) the lease provided for the mining of 12,000 tons of bauxite during the first year, and the year terminated on January 29, 1944; and (c) if the lease be construed to let mining operations extend for one year from April 2, 1943, then the year expired on April 2, 1944, and the 12,000 tons of ore had not been mined from the land by that last-mentioned date.

The cause was heard by the chancery court on oral testimony, and the record of evidence and exhibits is quite extensive. The chancery court decreed: (1) that the appellants were not entitled to cancellation of the lease; (2) that the complaint should be dismissed for want of equity; (3) that the appellants were enjoined from interfering with the action of the appellees in dumping spoil dirt on certain described portions of the land; (4) that each party pay its own costs; and (5) that the $5,950 tendered should be held in the registry of the court pending further orders.

From the decree appellants have appealed.

I. *The Sixty-Day Provision.* The lessee had thirty days from January 29, 1943, to determine the marketability of the lease or product therefrom, and sixty days *thereafter* to begin active mining operations. While the complaint alleged that there had been a failure to fulfill these requirements, the proof shows otherwise. As early as February 7, 1943, (less than ten days after the execution of the lease) test mining began on the land. In the early part of April, 1943, a shaft was being sunk to see if the bauxite could be mined by that method. It was discovered that the bauxite would have to be mined by open pit; and on April 28th a scraper and a tractor were in use removing the overburden. The recital of these dates shows that active mining operations began in due time. The ninety days from January 29, 1943, did not expire until April 29, 1943; the scraper and tractor were in use removing the top soil before that date.

The evidence amply supports the Chancellor's findings that appellants were not entitled to claim a forfeiture under the sixty-day provision in the lease.

II. *The Year in Which to Remove 12,000 Tons of Bauxite.* The appellants contend that the appellees had one year from the date of the lease (January 29, 1943) in which to remove 12,000 tons of bauxite. The appellees claim that the year started on April 28, 1943, when actual mining operations began on the land. These respective contentions necessitate a consideration of the language of the lease. We have copied the entire lease. The language in question reads:

"However if active mining operations shall have been begun within the said 90 days from the date of this lease, then this lease shall be and remain in full force and effect so long as active mining operations are conducted therein, with this provision, that a minimum tonnage of 12,000 tons per annum is removed from said lands annually."

Neither side has cited us to any case where this particular language has been construed; and our search has failed to discover such a case. We have, however, reached the conclusion that the lease intended, and the language means, that the lessee should have one year from the beginning of active mining operations in which to produce the 12,000 tons of bauxite. The bauxite could not have been removed until after the beginning of active mining operations. The language last quoted above stated that if the mining operations had been begun within the ninety days, then the lease would remain in full effect (1) so long as active mining operations were continued; and (2) as long as 12,000 tons of bauxite per annum were removed. The beginning of the *active mining operations* was the date necessarily fixed for the continued mining operations. Thus, since the "beginning of active mining operations" was the date for continuation of mining operations, so also it was the time from which the 12,000-tons-per-annum requirement started; and "beginning of active mining operations" thus becomes the point at which the mining year begins. This construction means

that if active mining operations began on April 28, 1943 (when the tractors and scraper were first used to remove the top soil for open pit mining) such was within the ninety days from January 29, 1943, and appellees had until April 28, 1944 (one year from the beginning of the said active mining operations) to produce the minimum of 12,000 tons required under the lease. Such is our holding.

III. *Premature Filing of This Suit.* The appellants filed this suit for forfeiture and cancellation on January 31, 1944, claiming a forfeiture for failure of the appellees to mine the annual minimum of 12,000 tons by January 28, 1944. As we have previously stated, the appellees had until April 28, 1944, to mine the minimum of 12,000 tons: so this suit was prematurely filed.

In 1 Am. Juris. 451 the rule is stated: "A cause of action must exist and be complete before an action can be commenced; the subsequent occurrence of a material fact will not avail in maintaining it. The rights and liabilities of the parties—that is, their rights to an action or to judgment or relief—depend upon the facts as they existed at the time of the commencement of the action, and not at the time of trial."

And in 1 C. J. S., § 125, p. 1391, the general rule is stated: "In equity, if there is no cause for equitable relief at the time the bill is filed, it cannot be maintained upon a cause accruing thereafter, . . ."

Our own cases are in accord with this general rule. In *Hornor* v. *Hanks,* 22 Ark. 572, this Court said in an equity case: "The law is expressly written, that the right of a plaintiff must be adjudicated upon as it existed at the time of the filing of his bill. Adams. Eq. 413; *Barfield* v. *Kelly,* 4 Russ. 359. And this court has decided that where a bill disclosed a good cause of action, but which had not accrued when the bill was filed, the bill could not be maintained. *Phebe* v. *Quillin,* 21 Ark. 490." To the same effect, see *Shreve Chair Company* v. *Manufacturers' Furniture Company,* 168 Ark. 756, 271 S. W. 954. See Annotation in 125 A. L. R. 612.

Therefore, we conclude that appellants could not claim, in this case, any forfeiture for appellees' failure to mine the minimum of 12,000 tons of bauxite by April 28, 1944, because this suit was instituted on January 31, 1944, which was prior to the expiration of the year for such removal, and appellants had no cause of action on the minimum tonnage requirement at the time of the filing of the suit.

IV. *Appellants Are Estopped to Claim a Forfeiture Pendente Lite.* Furthermore, the appellants could not claim a forfeiture that occurred after the filing of this suit to cancel the lease, because the period of time that the suit was pending would not count against the appellees. The rule in oil and gas cases in many instances is not applicable to a case involving solid minerals because of the fugitive nature of oil and gas. But in Thornton's *Oil and Gas* (5th Edition), vol. 2, § 276, we find this statement, which we think is applicable to the case at bar, involving a solid mineral:

"By unjustifiably bringing suit to cancel a lease, a lessor may postpone the development of the leased premises and put himself in a position to debar his right to insist upon a forfeiture for nondevelopment of the premises within the time fixed by the lease. Even conduct denying the validity of the lease and expressing an intention to terminate it may be such as will debar his right to have it forfeited for failure to develop the premises on time. Such conduct will usually postpone the development so long as it is indulged. The lessee is not bound to expend money, so long as such a threat overhangs the validity of the lease, in developing it."

The Texas Court of Civil Appeals in *Wisdom* v. *Minchen,* 154 S. W. 2d 330, in discussing this question said:

"In *Morgan* v. *Houston Oil Company,* (Tex. Civ. App.), 84 S. W. 2d 312, 314, it was held: 'It is well settled that when a lessor determines to forfeit or cancel an oil and gas lease, and puts the lessee on notice thereof, he cannot complain if the latter suspends operations under

the contract, pending the determination of the asserted right of the lessor to forfeit or cancel. *Lane* v. *Urbahn* (Tex. Civ. App.), 265 S. W. 1063, par. 3 (writ refused); *Edgar* v. *Bost* (Tex. Civ. App.), 14 S. W. 2d 364; *Johnson* v. *Montgomery* (Tex. Civ. App.), 31 S. W. 2d 160 (writ refused).' See, also, *Gwynn* v. *Wisdom,* 119 Tex. 320, 30 S. W. 2d 298. The owners of the working interest were not bound therefore to continue after such notice of forfeiture to develop the lease, and the lease will not be held to have expired because they did not continue such development."

See, also, *Amerada Petroleum Corp.* v. *Doering* (5th C. C. A.), 93 Fed. 2d 540, 114 A. L. R. 1385; *Hamilton* v. *Empire Gas & Fuel Company* (8th C. C. A.), 297 Fed. 422; *Leonard* v. *Busch-Everett Co.,* 139 La. 1099, 72 So. 749; *Lieber* v. *Ouachita Natural Gas & Oil Company* 153 La. 538, 95 So. 538; *Stine* v. *Oasis Oil Company* (Tex. Civ. App.), 290 S. W. 302.

While not directly in point, the language of this court in *Millar* v. *Mauney,* 150 Ark. 161, 234 S. W. 498, shows the trend of the decisions. In that case involving the mining of diamonds, Mr. Justice Wood said: "Good faith is required of both parties in the observance of their covenants. If the appellees, by their conduct in instituting lawsuits or in any other manner, put obstacles in the way of appellants which caused them to fail to perform their covenants, then the appellees would be estopped from setting up an abandonment or forfeiture by the appellants."

And in *Rogers* v. *Magnolia Oil & Gas Co.,* 156 Ark. 103, 245 S. W. 802, we find this language: "The institution of the action to cancel the lease was a repudiation of the continued existence of the contract, . . ."

Appellants, by prematurely filing this suit, are estopped from claiming any forfeiture that might have occurred during the pendency of the suit; and the period of time from the filing of this suit until its final disposition is not to be counted against the appellees as a part

of the year for the mining of the minimum of 12,000 tons of bauxite from the lease.

At the trial the appellees tendered to the appellants $5,950, which, with the $50 received by the appellants in November, 1943, would total $6,000, and is the amount of royalty appellants would have received if the appellees had mined the minimum of 12,000 tons of bauxite in the year. We do not regard this tender as compliance by the appellees with the mining provision in the lease, because the lease here did not—as the one did in *Arkola Bauxite Company* v. *Horn*, 184 Ark. 1044, 44 S. W. 2d 352 —allow the payment of royalty as an alternative to the actual mining. But we regard this tender as evidence of the appellees' good faith, and as going to show the appellees would mine the bauxite as soon as the litigation is terminated.

V. *Due Diligence in Developing and Mining the Bauxite.* Finally, and entirely independently of the minimum tonnage requirements as just discussed, appellants claim that they are entitled to a cancellation of the lease because of the failure of appellees to continue the mining. The lease contract stated:

"The intention of this lease is that the lessee shall begin active mining operation on said lease within 90 days from the date hereof and shall continue such operations in a workmanlike and business manner until such bauxite deposits is exhausted, or as long as bauxite can be mined and marketed at a profit to the lessee."

Appellants rely not only on the above provision of the lease, but also on the duty implied by law that the lessee will develop the property. Some of the cases recognizing and declaring the implied covenant of development with reasonable diligence are: *Mansfield Gas Co.* v. *Alexander,* 97 Ark. 167, 133 S. W. 837; *Millar* v. *Mauney,* 150 Ark. 171, 234 S. W. 498; *Smith* v. *Housley Mining Company,* 188 Ark. 1083, 69 S. W. 2d 865; *Rains Coal Corporation* v. *Southern Coal Company,* 202 Ark. 1077, 155 S. W. 2d 348. In 60 A. L. R. 901 there is an annotation on "Duty of Lessee or Purchaser of Mineral Rights

Other Than Oil and Gas as to Development and Operations." There is no question about the law on this point; the difficulty is in the facts in each case. As was well said by Judge VAN DEVANTER, while a member of the Eighth Circuit Court of Appeals, in *Brewster* v. *Lanyon Zinc* Co., 140 Fed. 801, 814:

"The object of the operations being to obtain a benefit or profit for both lessor and lessee, it seems obvious, in the absence of some stipulation to that effect, that neither is made the arbiter of the extent to which or the diligence with which the operations shall proceed, and that both are bound by the standard of what is reasonable. This is the rule in respect of all other contracts where the time, mode, or quality of performance is not specified, and no reason is perceived why it should not be equally applicable to oil and gas leases. There can, therefore, be a breach of the covenant for the exercise of reasonable diligence, though the lessee be not guilty of fraud or bad faith.

"But while this is so, no breach can occur save where the absence of such diligence is both certain and substantial in view of the actual circumstances at the time, as distinguished from mere expectations on the part of the lessor and conjecture on the part of mining enthusiasts."

In the case at bar, did the appellees "continue such operations in a workmanlike and business manner"?—did they exercise reasonable diligence in mining the bauxite? The facts show that prior to the filing of the suit activities of the appellees were:

(1) They had drilled twenty-nine test holes, and had located the bauxite some seventy feet below the surface.

(2) A shaft had been sunk before it had been determined that the bauxite could be obtained by pit mining better than by shaft mining.

(3) Equipment and machinery had been placed on the premises for removal of the top soil. This soil was also called "overburden," and was between seventy and

seventy-seven feet in thickness, and had to be removed before the ore could be mined. The places where the top soil was piled were called "spoil banks," and naturally became quite high as the pit became deeper. By December, 1943, 142,000 yards of top soil had been removed from the pit and placed in the spoil banks.

(4) In October, 1943, thirty-one tons of bauxite were actually mined from the property.

(5) Before the filing of this suit the appellees, in addition to the expenditure of $100,000 heretofore mentioned, had exposed 20,000 tons of ore for mining.

(6) Work was actually going on when this suit was filed.

Without detailing all of the testimony, we have reached the conclusion that the preponderance of the evidence shows that appellees continued the operations in a business and workmanlike manner, and used reasonable diligence in mining the bauxite and developing the property. The chancery court found that appellants were not entitled to have the lease canceled on this point, and we affirm the decree.

There is also in the record considerable evidence tending to sustain appellees' allegations that appellants had retarded the mining operations. Appellants had interfered with the work in the location of the spoil banks, and in the routes of ingress and egress taken by the trucks in removing the top soil from the pits, and also in frequent threats of litigation, thereby placing obstacles in the way of the appellees within the rule previously quoted from *Millar* v. *Mauney*, 150 Ark. 161, 234 S. W. 498:

"If the appellees, by their conduct in instituting lawsuits or in any other manner, put obstacles in the way of appellants which caused them to fail to perform their covenants, then the appellees would be estopped from setting up an abandonment or forfeiture by the appellants."

From all these facts the chancery court found that appellants were not entitled to have the lease canceled, and that the complaint of appellants should be dismissed for want of equity. We affirm the action of the chancery court in all respects in Cause No. 7474.

### No. 7461

Pending the appeal in Cause No. 7474, *supra,* the chancery court appointed a receiver to take charge of the property and receive $1.30 per ton from all bauxite mined from the premises and to hold the said moneys subject to the orders of the chancery court. From the order appointing the receiver, appellants prosecuted a separate appeal, which is Cause No. 7461 in this court. During pendency of the appeal the parties stipulated—without prejudice to either party—that the amount to be held by the receiver should be $2.10 per ton instead of $1.30 per ton, as fixed by the chancery court.

In this court the appellees have filed various pleadings in the receivership appeal, showing that during pendency of this appeal, some 60,000 tons of bauxite have been produced from the premises, and $30,000 of accumulated royalties were tendered to the appellants. The appellants have countered these pleadings with a motion to strike.

Many interesting questions are presented as to the regularity and correctness of the procedure. Even the question of jurisdiction is raised. But we forego discussion of any of these matters, because we regard the entire appeal in Cause No. 7461 as rendered moot by our decision and opinion in Cause No. 7474.

The purpose of the receivership was to allow the appellees to mine the bauxite and deliver a good title thereto pending final decision of this court in Cause No. 7474. The purpose of the receiver's holding $2.10 per ton was to compensate appellants for any damages that might have accrued if the lease should be held canceled in Cause No. 7474. Since the lease has been held to be in full force and effect in Cause No. 7474, it follows that

appellants are entitled only to the contract royalty of fifty cents per long ton of dry bauxite mined and removed from the land.

Therefore, being moot, the receivership appeal is dismissed, and the chancery court is left free to proceed to make distribution of the funds in accordance with the respective rights of the parties as fixed in the opinion in Cause No. 7474.

The costs of this court in Cause No. 7474 and also in No. 7461 are taxed against appellants.