## In re MORGANTOWN TIN PLATE CO.

(District Court, N. D. West Virginia. January 4, 1911.)

1. BANKRUPTCY (§ 318*)—CLAIMS—VALIDITY.

Claimant and a railroad company, in order to induce the bankrupt to remove its rolling mill location, agreed to convey to it 15 acres of land on which to erect a new plant, to operate a railroad switch along the front and rear of the buildings, to take $50,000 of the mill company's bonds at par, to convey to it at $50 an acre 150 acres of coal, one-third of the proceeds to be credited on the $20,000 bonus later to be provided for, to pay the company's taxes for the first five years, and to transport materials at reduced rates, etc., in consideration of which the bankrupt agreed without unavoidable delay to locate, conduct, and put into operation on the new site a rolling mill, and to continue to operate the same, strikes and unavoidable hindrances and delays excepted, for five years, etc. The mill removed its plant, and claimant conveyed 15 acres, applied for and paid for the bonds, paid $17,450 of the $20,000 bonus, but did not convey the 150 acres of coal land, nor did he pay the company's taxes as agreed. *Held* that, the mill company having been prevented from continuing operations because of financial embarrassment and bankruptcy, claimant and the railroad company were not entitled to rescind the contract, they being also in default, and recover against the corporation's estate in bankruptcy a portion of the bonus paid and the difference in freight charges.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 479; Dec. Dig. § 318.*]

2. CONTRACTS (§ 261*)—RESCISSION—PERFORMANCE—BREACH.

Where a contract has been partially executed, and one of the parties has derived substantial benefit therefrom, or has imposed material losses on the other through partial performance, the first party cannot rescind on account of the second party's failure to complete his performance, but the agreement must stand; the first party performing his part of it recovering compensation in damages for the second party's breach.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1174, 1175; Dec. Dig. § 261.*]

3. CONTRACTS (§ 265*)—RESCISSION—STATU QUO.

A contract cannot be rescinded because of the failure of one of the parties to perform, where both parties cannot be restored to statu quo.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. § 1187; Dec. Dig. § 265.*]

In the matter of bankruptcy proceedings of the Morgantown Tin Plate Company. On petition to review a referee's order allowing claims of George C. Sturgiss and Morgantown & Kingwood Railroad Company and by Sturgiss as assignee of George J. Humbird. Reversed as to claims of Sturgiss and the railroad company, and affirmed as to Humbird.

B. M. Ambler, for claimants.
Reese Blizzard, for contestants.

DAYTON, District Judge. The litigation, involving the affairs of this bankrupt, commenced before I assumed the bench, in this bankruptcy proceeding and in the equity cause of the Canton Roll & Machine Company v. Rolling Mill Company of America, has already been the subject of one opinion by myself and of two by the Circuit Court of Appeals for this circuit, from which the material facts can be obtained., Sturgiss v. Corbin, 141 Fed. 1, 72 C. C. A. 179; Canton Roll & Mach. Co. v. Rolling Mill Co. (C. C.) 155 Fed. 321; Canton Roll & Mach. Co. v. Rolling Mill Co., 168 Fed. 465, 93 C. C. A. 621. The matters now in controversy are three claims of George C. Sturgiss for $17,450, of the Morgantown & Kingwood Railroad Company for $1,-741.40, and of George C. Sturgiss, assignee of George J. Humbird, for $3,746.47, upon all three of which interest is claimed from October 2, 1903. It is to be remembered that the proceedings in this bankruptcy case have been out of the usual order. My predecessor, by decree entered in it in 1904, directed a sale of the plant and property of the tin plate company to be made at once, free and acquit from liens, by commissioners appointed and not by the trustee. Such sale was made by the commissioners first to one Fisher at $154,000; but, Sturgiss offering to bid $160,000 for the property, bidding was reopened, and it was sold a second time to Sturgiss for $200,200; but, when this sale in turn came up for confirmation, Fisher securing a bid of $208,-000, again bidding was reopened, and it was then sold to Fisher for $220,000, to whom the sale was confirmed. Sturgiss appealed, and the Circuit Court of Appeals sustained this appeal and directed this last sale to Fisher to be set aside and the sale of the property to be confirmed to Sturgiss at $200,200.

In this decision (141 Fed. 1, 72 C. C. A. 179) the action of the court in taking charge directly of the sale and decreeing the property to be sold by commissioners appointed by it, instead of allowing the referee to decree the sale by the trustee, was expressly affirmed; the court there saying:

"The order of the court below directing a sale of the property clear of all liens, claims, and incumbrances was, under all the circumstances, a wise exercise of judicial discretion, being such action as the bankrupt act contemplates and provides for in those instances when the nature and location of the property makes it desirable, in the interest of the creditors, that the same be sold as soon as practicable. The act does not require that such sales be made by the trustee in bankruptcy, and, while ordinarily it will likely be best and more convenient that such official conduct such sales, still there are doubtless many cases in bankruptcy where it is entirely proper for the court to exercise right to designate the officer it wishes to conduct the sale it is authorizing; such designation being other than the trustee."

The proceeds of sale having been paid in cash to the commissioners, and they having paid them into court, the same were deposited with the court's registrar, and, after paying under decrees from time to time, certain debts as their validity was determined, he has retained the fund subject to the direct order of the court, and not under the orders and administration of the referee.

The litigation referred to has delayed necessarily a final distribution of this fund, but on June 17, 1909, the referee was, by decree entered by the court, directed to ascertain and report "the general and lien

creditors of said bankrupt, and who are the stockholders thereof, respectively, with the amounts of debts and stock respectively and who are entitled to be paid on account thereof, in order to a final distribution." Under this order the referee has reported that every debt against the bankrupt, except the three in controversy, and one due the sheriff of Monongalia county for taxes, have been paid, leaving a balance of $51,174.07 in the registrar's hands, from which, if said three claims and their interest be paid, a balance of $17,935.93 would remain to be distributed to stockholders. To the allowance of these claims exceptions are made, and the matters are brought to my attention by such exceptions to this report.

This explanation has been made, in order that it may be made apparent that this fund was taken charge of and has been administered by the court and not under the orders and directions of the referee as in ordinary cases, that the referee in effect has acted in the capacity of a special master rather than as a referee, and that therefore it becomes unnecessary to consider the technical objections taken to the pleadings had before and the rulings made by the referee in his conduct of the proceedings before him. It seems to me, disregarding all these technicalities, it is my duty under the peculiar conditions to determine from the actual facts existing as shown by the records and the reports of the referee whether these three claims are valid or not. Two of them, the one claimed by Sturgiss for $17,450 and the other by the Morgantown & Kingwood Railroad Company, which, as shown by the evidence of Sturgiss, is now owned by him, have substantially the same basis. It appears that in May, 1902, the Rolling Mill Company of America, a New Jersey corporation, now defunct, with a cash capital of $100,000, owned by New York parties, commenced building its plant at Connellsville, Pa., and had expended something like $17,000 thereon when applied to by Sturgiss to change its location to a point at the then terminus of the Morgantown & Kingwood Railroad, running something like four miles up Deckers Creek from Morgantown. Sturgiss was at the time the substantial owner of this railroad and owned real estate at the point where he sought to have the plant located. The negotiations resulted in a contract between the Morgantown & Kingwood Railroad Company and Sturgiss, jointly, of the first part, and this Rolling Mill Company of America of the second part, under date of May 9, 1902, whereby the railroad company and Sturgiss agreed: (a) To convey or cause to be conveyed by deed within 10 days to the Rolling Mill Company 15 acres upon which to erect its plant; (b) to operate a railroad switch along the front and rear of the buildings to be erected; (c) to take or cause to be taken $50,000 of first mortgage bonds of the mill company at par; (d) to convey to the mill company at a fixed price of $50 per acre 150 acres of coal, one-third of the proceeds to be credited upon the $20,000 bonus later provided for, and the residue payable within one, two, and three years; (e) to transport the coal from this 150 acres to the mill company's plant for five cents per ton; (f) to pay the mill company a $20,000 bonus; (g) to pay its taxes for the first five years; (h) to make a switching charge between the company's plant and the Baltimore & Ohio Railroad Company's con-

nection at Morgantown of one dollar per car until agreed freight rates were arranged; (i) in case the Baltimore & Ohio Railroad Company refused to allow usual reductions in freight rates on construction materials employed in building the plant, to pay the difference between rates charged and such usual reduced rates. In consideration of these things to be done by Sturgiss and the railroad, the Rolling Mill Company agreed, without avoidable delay: (1) To locate, construct, and put into operation on this site a rolling mill, and to continue to operate the same, strikes and unavoidable hindrances and delays excepted, for a term of five years, giving employment to about five hundred people; (2) after expending $100,000 upon all of its property in buildings, machinery, and equipments, to secure $150,000 of first mortgage bonds.

The Rolling Mill Company proceeded to move its plant. Sturgiss became a stockholder of it and its legal adviser. He conveyed the 15 acres, subscribed and paid for $50,000 of its bonds which have long since been paid to him under decree in this cause, paid $17,450 of the $20,000 bonus agreed upon, but did not convey the 150 acres of coal, title to which he did not then have, but subsequently procured and sold to others, nor did he pay the company's taxes. Upon his advice a new corporation was almost immediately formed under the laws of West Virginia, known as the Morgantown Tin Plate Company, which took over the Rolling Mill Company's property, assumed its obligations, and the latter was permitted to become defunct. This tin plate company erected its plant upon the 15 acres, installed its machinery, expended near $200,000 in doing so, could not float the remainder of its bonds, became embarrassed, and on the 2d day of April, 1904, was declared by this court bankrupt. Sturgiss now claims that the consideration for the bonus or part thereof paid by him to secure the removal of the plant has failed, and that he is now entitled to recover back the $17,450 so paid with its interest out of the proceeds of the sale, and upon the same theory that the consideration has failed for this contract, which provided that the railroad company was to be paid for transporting the mill company's material from Morgantown to the plant $1 per car, the claim for $1,741.40 for full freight charges is now brought forward by the railroad company. The referee reports favorably upon both these claims, and exceptions are taken.

It is well settled that in construing a contract courts have right to consider not only the language employed, but the subject-matter and surrounding circumstances, not for the purpose of changing the contract, but to furnish light by which to ascertain its actual significance. Merriam v. United States, 107 U. S. 437, 2 Sup. Ct. 536, 27 L. Ed. 531; Walker v. Brown, 165 U. S. 654, 17 Sup. Ct. 453, 41 L. Ed. 865; Runkle v. Burnham, 153 U. S. 216, 224, 14 Sup. Ct. 837, 38 L. Ed. 694. It is also well settled that, when a contract has been partially executed, and one of the parties has derived substantial benefits, or has imposed upon the other material losses through the latter's partial performance of the agreement, then the first party cannot rescind the contract on account of the failure of the second party to complete his performance; but the agreement must stand, the first party must perform his part of it, and his only remedy for the failure of the second party

to completely perform is compensation in damages for the breach. Howe v. Howe & O. B. B. Co., 154 Fed. 820, 826, 83 C. C. A. 536, 542; Kauffman v. Raeder, 108 Fed. 171, 179, 47 C. C. A. 278, 286, 54 L. R. A. 247. It is only when the parties to the agreement can be placed in statu quo that one may rescind or repudiate the entire contract for the failure of the other to perform it. Kauffman v. Raeder, supra, where more than 20 cases from the Supreme Court, the Circuit Court of Appeals, and state courts of last resort are cited to support these principles. See, also, Lake S. & M. S. Ry. Co. v. Richards, 152 Ill. 59, 38 N. E. 773, 30 L. R. A. 33, and the elaborate note appended, wherein the whole subject is exhaustively considered.

That the contract was partially performed there can be no denial. By reason of it the Rolling Mill Company abandoned its plant at Connellsville upon which had been expended, as stated, something like $17,-000. It came with the balance of its cash capital and located this plant on the land provided by the contract, through its successor, the tin plate company, was erected a mill larger than contemplated, which was equipped with the necessary machinery, involving in all an expenditure of near $200,000, and it executed the $150,000 mortgage provided by the contract. In short, it would seem the only thing required by the contract of it, which was not fully performed, was a five years' operation of the mill at a capacity to employ about 500 people. It was prevented from doing this because of financial embarrassment and bankruptcy. As a legal proposition insolvency or bankruptcy alone does not, in a contract of this kind, constitute either breach or authorize its rescission or abandonment, for it may be finally and fully performed by others who may be acting, for instance, as trustee or as successors or purchasers of the bankrupt's property and rights involved therein or affected thereby. Lester v. Webb, 5 Allen, 569; Carey v. Nagle, Fed. Cas. No. 2,403; Vandegrift v. Cowles Eng. Co., 161 N. Y. 435, 444, 55 N. E. 941, 48 L. R. A. 685; Loveland, Bankruptcy (3d Ed.) 509.

And this requirement of the contract has now been practically complied with by the successors through purchase of the property and rights of the Morgantown Tin Plate Company, successor of this Rolling Mill Company by whom the contract was made. The records of this litigation disclose that, after the bankruptcy sale of the property was ordered, Sturgiss took his own course to save himself from loss by entering into a contract with the American Tin Plate Company, whereby he undertook to purchase the property at the judicial sale and then sell it to this company upon terms agreed upon; that the New York stockholders secured Fisher to become a bidder for it; that Fisher became, twice, the purchaser thereof; that his first purchase at $154,000 was set aside at Sturgiss' instance; that his second purchase at $220,000 was likewise set aside at Sturgiss' instance, so that Sturgiss himself could secure the property at $200,200; that Sturgiss conveyed it at once to the American Tin Plate Company; and that this company has been operating it satisfactorily since. If it was not complied with by the original parties in interest, apparently it was because Sturgiss insisted upon purchasing and having it carried out by those of his own choosing. But it is suggested in argument of counsel that Sturgiss in-

184 F.—8

curred a loss of $80,000 in all this. Suppose this be true, how does it affect this matter? If he saw fit to enter into a contract of hazard with the American Tin Plate Company, whereby he undertook to buy at a future public sale the property and then to convey it to this latter company at a fixed price, and at the sale found another bidder prepared to give a much larger sum than he had expected the property to sell for, whereby he was compelled to buy at such advance price as caused him, when he came to fulfilling his contract with the American Company, to undergo this loss, whose misfortune was it but his own? It is clear, too, that he is as much in default, in my judgment, in complying with the original contract with the Rolling Mill Company as the latter was. He was to give a bonus of $20,000, and he was to secure title and convey 150 acres of coal to the company at $50 per acre, one-third of which purchase price was to be credit on this bonus. He took credit for the one-third purchase money, but never conveyed the coal. In fact, he secured title to it and sold it to another and appropriated the proceeds.

How could it be possible, under such circumstances, to rescind the contract partially performed on both sides and restore the statu quo as the law requires? Yet a rescission of the contract because "of failure of consideration," and a restoration to the railroad company of its full freight charges and to Sturgiss of all the bonus paid by him with interest, is exactly what is asked here; no less, no more. It is impossible for me to perceive how this can be done under any principle of law, equity or good conscience, and the exceptions to these two claims will be sustained, and they will be disallowed.

As to the Humbird claim, it stands on a different footing. It is based upon services and money claimed to be advanced by him. It is true the records disclose that Humbird is entitled to little sympathy, that his management as superintendent was bad, his reports to the New York stockholders were misleading, and his promises were wholly unreliable. Nevertheless it seems the company permitted him to remain in charge and did not dismiss him.

Therefore I think this claim will have to be paid, and exceptions to it will be overruled.