J. T. PATTERSON, T. M. Patterson and W. A. Patterson, Plaintiffs,

v.

ALABAMA VERMICULITE CORPORATION, a corporation, Defendant.

Mrs. Vivian Campbell PATTERSON, Plaintiff,

v.

ALABAMA VERMICULITE CORPORATION, and W. J. Theo, Joe Theo and Olin Theo, partners, d/b/a Theo Bros. Construction Co., Defendants.

Civ. A. Nos. 1313, 1747.

United States District Court
W. D. South Carolina,
Greenville Division.
Feb. 14, 1957.

See also 149 F.Supp. 534.

Edward P. Riley, Greenville, S. C., R. L. Gray, Laurens, S. C., for plaintiffs.

Alfred F. Burgess, Wyche, Burgess & Wyche, Greenville, S. C., John H. Bishop, Bishop, Burdett, Falasz & Doherty, Chicago, Ill., for defendants.

WILLIAMS, District Judge.

The mining lease dated May 22, 1951, and the property therein described, have been the subject of litigation in this Court since September 4, 1952, when the initial action was brought by Alabama Vermiculite Corporation (hereinafter sometimes referred to as Alabama) for a declaratory judgment. It has been the subject of three rather exhaustive orders dated April 20, 1954, April 21, 1955 and December 15, 1955. The first two orders are reported in 124 F.Supp. 441 and 130 F.Supp. 867, respectively, to which reference is made.

In the first order (April 20, 1954) this Court held 1) that the lease was valid; 2) that it had not been breached by Alabama; 3) that it was breached by the lessors, J. T. Patterson, W. A. Patterson and T. M. Patterson (hereinafter sometimes referred to as the Pattersons), on January 30, 1952, by their refusal to ship ore upon orders placed by Alabama; and 4) that Alabama was entitled to exclusive possession of the leased premises for the purpose of mining vermiculite ore therefrom in accordance with the lease. The Pattersons served notice of appeal from that order but failed to perfect the same; the appeal was dismissed by consent order dated June 14, 1954, at which time Alabama became entitled to the exclusive possession decreed by the Court.

No mining operations were carried on on the premises from January 30, 1952, until June 14, 1954, a period of 28½ months.

From the date of the dismissal of the appeal until December 13, 1954, Alabama was technically in possession of the premises and was permitted to mine vermiculite ore therefrom. During all this time, however, there was friction between the parties. The Pattersons on November 4, 1954, gave notice that the lease had been terminated by failure of Alabama to pay for the ore mined under it. As a result of this notice Alabama thereafter mined only two cars and on December 13, 1954, brought the second proceeding for a declaratory judgment that the lease was in effect and had not been breached. By supplemental petition a contempt citation was obtained against the Pattersons for their failure to obey the Court's order of April 20, 1954, directing them to give Alabama exclusive possession of the premises.

This second proceeding terminated in an order dated April 21, 1955, reported in 130 F.Supp. 867, in which this Court

again found 1) that Alabama was proceeding in accordance with the provisions of the lease, and 2) that the Pattersons were violating its terms and the previous order of April 20, 1954, construing the same. In fact, the Court was of the opinion that the Pattersons were wilfully and intentionally interfering with the operations of Alabama and were in reality in contempt of Court. The Court at that time gave them the benefit of a doubt and assumed that their actions were prompted through ignorance rather than intent or design. In said order this Court determined that the Pattersons had unlawfully interfered with Alabama's use and enjoyment of the leased premises to such an extent that the lessee was unable to properly mine the ore from the middle of September, 1954, to February, 1955, 4½ months.

Prior to the termination of the second proceeding, on April 21, 1955, Vivian Campbell Patterson, the wife of T. M. Patterson, one of the lessors, on March 17, 1955, filed suit in the Court of Common Pleas for Laurens County, South Carolina, for admeasurement of dower, for damages for waste and for an injunction. A temporary injunction and rule to show cause was granted by the State Court Judge on said date without notice, which restrained Alabama from further mining. The rule was returnable on May 9, 1955, almost two months after it was issued. Despite the fact that this was a drastic remedy and should, therefore, have been served promptly, the complaint and rule was not served on Alabama until April 26, 1955, after this Court's order of April 21, 1955, had been filed but before T. M. Patterson was served by the marshal.

The State Court proceeding was removed to this Court and at the same time, Alabama filed a petition for consolidation of the cases (C.A. 1313 and C.A. 1747), for adjudication of the alleged claim of waste, for admeasurement of Mrs. Patterson's dower rights, for injunction and other relief.

After a hearing on the rule to show cause issued by this Court on Alabama's verified petition, the State Court injunction was dissolved and Alabama was restored to possession of the premises by oral order from the bench on June 22, 1955. On December 15, 1955, this Court by a third formal and more exhaustive order, 149 F.Supp. 534, disposed of the various motions that were raised in the removed State Court proceeding (C.A. 1747) and in the petition of Alabama (C.A. 1313).

As a result of the South Carolina action of the wife of T. M. Patterson, Alabama was enjoined from using the premises for 26 more days.

Subsequent to the order of December 15, 1955, the Pattersons on February 23, 1956, filed a proceeding in Civil Action No. 1313 alleging waste, which was denied by Alabama. Alabama asked that the lease be extended for a period of time equal to the time during which it had been unlawfully deprived of possession by the Pattersons. At a pre-trial conference it was agreed that the Pattersons' claim of waste would be limited to the period of time subsequent to April 21, 1955; and it was also agreed that the issue of a five-year renewal from May 22, 1956, was presented.

On this latter issue, the records show that notice was properly served on the Pattersons by Alabama in accordance with the provisions of Paragraph one of the lease, so that the question of the five-year renewal hinged on whether or not Alabama "had satisfactorily carried out his [its] duties under this contract." Alabama also requested an interpretation of the lease regarding the method of measuring ore removed from the mine and the method of transporting it from the mine to the mill.

The Pattersons demanded a trial by jury on their complaint which charged Alabama with waste. All other pending issues were reserved for decision by the Court without a jury. Evidence was taken before the Court and jury on October 29, 30 and 31, 1956, on all issues then pending, the issue of waste alone being submitted to the jury. There was a verdict by the jury against Alabama for

$5,000 damages. A motion for judgment notwithstanding the verdict and for a new trial was duly filed by Alabama and argued to the Court on November 9, 1956. After the argument of the motion for a new trial and by consent of counsel, the Court visited the premises in order to familiarize itself with the mining operation and be able thereby to more readily dispose of the pending issues.

It should be here stated that during the course of the trial W. J. Theo, Joe Theo and Olin Theo, partners, d/b/a Theo Bros. Construction Co., who were parties defendant in the State Court proceeding, were dismissed by agreement. The issue as to Mrs. Patterson's inchoate right of dower was determined by agreement between the parties.

The evidence developed the fact that a new processing plant had been constructed at Kearney, S. C., a distance of some three miles from the mine, which mill could process much lower grade ore than the mill to which shipment had been made in the past at Travelers Rest, S. C. The two mills were owned and operated by the same company (Zonolite Company). The evidence also showed that there was no practical way of shipping by rail from the mine to the mill at Kearney, S. C. As against this, the truck haul from the mine to the mill and the weighing of the same on Zonolite's scales located on the road leading to the Kearney plant was a rapid and economical way of transporting.

The development of the mine was at a standstill following the October, 1956 trial. The Court, therefore, on November 15, 1956, filed its memorandum of decision indicating its conclusions on the various issues with the intention of embodying the same in a more formal order to be thereafter filed. Subsequent to the filing of this memorandum the Pattersons asked to be again heard on some of the issues with which the memorandum dealt (3, 4, 5, 6 and 7 of the memorandum of decision dated November 15, 1956).

Pursuant to their request, the Court heard further arguments on December 28, 1956. After due consideration of the arguments and the authorities cited, this Court is still of the opinion that the conclusions stated in the memorandum of November 15, 1956, are correct. The Court, therefore, makes the following disposition of the issues covered by its previous memorandum:

1. Motion for Judgment Notwithstanding the Verdict and in the Alternative for a New Trial

As hereinabove stated, the Pattersons' cause of action involved the charge 1) that Alabama had cleared off timber from the area around deposit No. 2 in such a manner as to make it worthless, and 2) that Alabama had wilfully, maliciously and intentionally removed and dumped vermiculite ore "for the only purpose of injuring and damaging the property of these plaintiffs."

On the issue of removal of trees, no evidence was introduced. Furthermore, Paragraph six of the lease gave Alabama the right to remove timber and "any and all other obstructions which might in any way impede the lessee in the mining, *storing* or removal of vermiculite ore from the leased property." (Emphasis added.) The second allegation is reminiscent of the charge made by the Pattersons in 1952 that Alabama fraudulently dumped vermiculite ore in the creek to avoid paying royalty thereon. Since the charge involves the allegation of fraud, the proof must be clear and convincing. See Holley Coal Co. v. Globe Indemnity Co., 4 Cir., 1950, 186 F. 2d 291, at page 296, where Judge Dobie said: "It is true that when fraud or dishonesty is an element of a civil suit, it must be shown by clear and convincing evidence." (Citing cases.) See also the former opinion in this case reported in 124 F.Supp. 441, 449 and other cases therein cited.

Alabama denied these charges of fraudulent conversion of ore and the issue resolved itself into the propriety of stockpiling in the vermiculite mining industry. Six different areas were referred to generally in the testimony but

the issue boiled itself down to three specific areas which will be referred to as Stockpile No. 1, Stockpile No. 2 and Stockpile No. 4 as they were referred to in the testimony. The evidence showed that Alabama had stockpiled a quantity roughly estimated at from 5,000 to 5,238 cubic yards of raw material on the left of the road going into the mine. This is what was referred to as Stockpile No. 1. Alabama also discarded a quantity of dirt, rocks and debris on the right-hand side of the road leading into the mine. This was referred to in the testimony as Stockpile No. 6. All the testimony showed that it was nothing but waste. The Pattersons testified that about five or six truck loads of this Stockpile No. 1 was good, high-grade vermiculite but that it had been mixed with the other ore in the stockpile so as to make it impossible to get more than a 50% recovery. The royalty calculated by them on the estimated tonnage in this stockpile would amount to between $2,400 and $2,500. The evidence of both plaintiffs and defendants showed that the ore so stockpiled had approximately 30% of vermiculite content; that it would yield approximately 21 bags per ton and that it was not feasible to process ore unless a yield of approximately 40 bags per ton could be expected. The transportation and processing costs are a major item in the mining and milling of vermiculite. The evidence further showed that the ore in this Stockpile No. 1 could not be transported, milled, processed and sold at a profit under the conditions at the time it was removed from the mine and stockpiled. The ore, therefore, could not be classified as merchantable ore. Defendant's witnesses testified without contradiction that the new mill which had been recently constructed at Kearney, S. C. was designed to process ore of a lower grade than that which could have been previously processed at a profit; that the ore had been stockpiled with the expectation that it could be processed through the new mill provided it could be hauled by truck from the mine to the mill without expensive intervening railroad transportation; that the mill at Kearney had

been completed in March of 1956, but that the floatation process which was designed to accommodate this low-grade ore had been placed in operation only a week before October 29, 1956, when the trial of this case began; that it was the intention of Alabama to put this low grade ore in Stockpile No. 1 through said floatation process, paying the Pattersons their royalty at the time it was removed from the leased premises. As a matter of fact, the Vice President of Alabama committed his company unqualifiedly to remove and process this stockpile at the trial of the case. If this is done, it will result in the Pattersons getting more royalties than they would have been entitled to according to their own testimony.

The stockpiling of vermiculite ore on the premises which is not merchantable at the time it is removed from the mine is a customary mining procedure in the industry and is not even waste, let alone a wilful and malicious disregard of the rights of the lessor.

As to Stockpile No. 2, this constituted an area where Alabama had pulled down a part of the dirt and vermiculite from the hill in order to establish a platform, or what was referred to in the testimony as a bench, so that the power shovel could drag up a bucket full of ore from the face of the mine, swing around and load it into a waiting truck which would then drive off to the stockpile or railroad siding. The Pattersons made no test of this stockpile. However, it was tested by a competent geologist and found to contain 25.7% vermiculite which would yield 15.9 bags per ton. The evidence showed, as hereinabove pointed out, that such a yield was not profitable and this ore could not, under the evidence, be considered as merchantable. Furthermore, if it should develop that the ore in this area has a market value in the future it can be recovered when another bench is established lower down the hill when the mining is done at a lower level. Vermiculite ore is mined by what is known as the "open pit process", beginning with the top or crown of the

deposit rather than by subterranean process of extracting at the base of the hill. This is a proper mining procedure and would not constitute waste.

As to Stockpile No. 4, the evidence showed that this is what is called the "overburden", dirt, rock, sand and other debris which is removed from the surface of the ground in reaching and delineating the main body of the ore deposit. It is natural to expect that in this overburden will be found some quantity of vermiculite and that some small part of it might yield sufficient bags per ton to make it merchantable. In removing the overburden and in preparing Deposit No. 2 for mining, small pockets of relatively good vermiculite were undoubtedly encountered by Alabama but this was not of a quantity and quality to render it merchantable. The Pattersons made no test of this stockpile. The test of the qualified geologist employed by Alabama showed that a test of the ore taken from the cuts made by the Pattersons in this overburden yielded only 15.8 bags per ton. The evidence shows that it is not merchantable.

Aside from the charge of fraud, there was no evidence that Alabama had operated the mine in a negligent manner or in disregard of the rights of the Pattersons. In fact, when the Court visited the mine it was impressed with the neatness of the property and the efficient manner in which it had been developed. The Court was likewise impressed with the careful way in which the mining property had been explored, drilled, tested and developed and with the thought and planning that had been given to developing the entire operation in an orderly way.

Plaintiffs contended at the trial that the defendant had removed good vermiculite ore and had deliberately mixed this ore with rock and dirt for the purpose of injuring the plaintiffs. This evidence was flatly contradicted by defendant's witnesses and is wholly negatived by an inspection of the stockpiles themselves. It is the view of this Court that the stockpiling of ore not merchantable when removed from the mine cannot be

waste or negligent or wilful mining such as will give rise to an action for damages. The Court is, therefore, of the opinion that the verdict on the issue of waste was against the manifest weight of the evidence and that it should be set aside and a new trial granted. If the defendant proceeds with its removal and processing of Stockpile No. 1 as testified at the trial, any claim of waste or fraudulent or negligent mining as to this ore will become moot. As to the other two areas (Stockpile No. 2 and Stockpile No. 4), the Court holds as a matter of law that the actions of Alabama in respect to these areas are in accordance with good mining practices and cannot give rise to an action for waste. A new trial by jury on the issue of fraudulent or negligent mining might thus be avoided. The Court will determine the necessity of trying this issue as to Stockpile No. 1 after Alabama is given an opportunity to remove and process it in accordance with the plan and procedure laid before the Court.

2. Vivian Campbell Patterson's Inchoate Right of Dower

This issue was settled by agreement of the parties. As heretofore pointed out, the warranty in Paragraph nine of the lease protects Alabama from all claims, including Mrs. Patterson's right of dower as the wife of T. M. Patterson. Under the settlement agreement it is conceded that she is entitled to 1/6th of the 1/3rd royalty payable to her husband under the lease, or 1/18th of the entire royalty payable thereunder. By previous order the Court directed that said amount be deposited with the Clerk of this Court pending determination of her claim. The amount so deposited with the Clerk of Court will, therefore, be disbursed to Mrs. Patterson and in the future Alabama will make payments to her in accordance with this order, deducting such payments from the share of her husband, T. M. Patterson.

3. Renewal of Lease for Additional Five-Year Term

Paragraph one of the lease provides that the lessee shall have an option to re-

new "for an additional period of five years upon ninety days notice by registered mail of the Lessee's intention so to do, provided said Lessee has satisfactorily carried out his duties under this contract."

In accordance with the above provision, Alabama on or about July 1, 1956, served notice of renewal of the lease for a further term of five years. No questions have been raised as to the efficacy of the notice, but the Pattersons now contend that Alabama has not satisfactorily carried out its duties under the contract and, therefore, the extension is not valid.

■ In the orders heretofore entered by this Court on April 20, 1954, 124 F. Supp. 441, and April 21, 1955, 130 F. Supp. 867, and December 15, 1955, 149 F.Supp. 534, this Court has held that Alabama was not in default in the performance of its duties and obligations under the lease. This is all a matter of record and is res adjudicata in this case so far as any breach of the lease can be predicated on the numerous and trivial charges that were leveled against Alabama by the Pattersons in those prior proceedings.

If Alabama has not satisfactorily carried out its duties under the lease, such conclusion must be found in the alleged claim for fraudulent breach of contract that is the subject matter of this proceeding.

■ As this Court has indicated in its findings with reference to a new trial, the issue turns on the question of whether the stockpiling of non-merchantable vermiculite ore is fraudulent or negligent or wasteful mining. Since the Court has granted a new trial on the ground that such conduct does not constitute waste it must follow here that such stockpiling would not constitute a lack of satisfactory performance under the lease such as would nullify the renewal. The question resolves itself into a determination of what the parties intended by the use of the words "satisfactorily carried out its duties under this contract." The Pattersons contend that the word "satis-

factorily" means satisfactory to the lessors and that they have the sole right to determine whether or not the operation has been satisfactory, that said determination is not subject to review by judicial authority and that the question should not be determined on the basis of what should be satisfactory to a reasonable person. This Court said in Kauffman v. Raeder, 8 Cir., 108 F. 171, 175, 47 C.C.A. 278, 282, 54 L.R.A. 247:

"That the situation of the parties when the contract was made, its subject-matter, and the purpose of its execution are material to determine the intention of the parties and the meaning of the terms they used, and that when these are ascertained they must prevail over the dry words of the stipulations."

This holding is quoted with approval by the Eighth Circuit in Watchorn v. Roxana Petroleum Corporation, 5 F.2d 636, 646. See, also, In re Morgantown Tin Plate Co., D.C., 184 F. 109.

In this connection we must consider the fact that at the time the lease was entered into the Pattersons were appointed agents of the lessee to mine and load the raw ore at $4 per ton, in addition to the 75¢ per ton royalty. It was on account of their unsatisfactory and unlawful breach of the contract that the Court found it necessary to take the property out of their hands and turn it over to Alabama under Paragraph four of the lease so that it might enjoy the rights to which it was entitled thereunder. We must also consider the fact that Alabama after going into possession built access roads, scientifically explored the deposits by core drilling, cut the timber from the two deposits found on the property and removed the overburden therefrom and opened the mine for removal of the ore and otherwise prepared the property for large-scale mining at considerable cost. All this work was done after September, 1954. When Alabama was put into possession and before it was able to remove any ore and thus reap the benefits of its lease, as hereinabove set forth and as will be hereinafter more fully discussed, through no fault of its own it was kept

out of possession for more than half of the initial period of the lease. It has at all times attempted to cooperate with the Pattersons but its efforts in this respect have not met with reciprocal treatment by them. Indeed, as has been heretofore orally expressed by the Court, it seems that the Pattersons are determined that the lease shall not remain in full force and effect as originally written and are throwing up every conceivable roadblock, so to speak, to prevent Alabama from exercising the rights to which the Court has held that it is entitled under the lease.

 The evidence shows that the mining was done in accordance with accepted mining practices in the locality where the mine is situated, having due regard for the size of the operation, the tonnage to be removed and the equipment to be employed. This Court has heretofore held that Alabama has a right to take such persons and equipment as it deems necessary on to the property for the purpose of mining it. Under such circumstances the Pattersons cannot reject performance as unsatisfactory from mere whim or caprice. Nor can they reject as unsatisfactory, performance which under the circumstances they should have accepted as satisfactory. If performance was such as a reasonable person would expect under the circumstances, it is sufficient legally to constitute satisfactory performance under the lease.

Substantial quantities have been removed by Alabama under all the circumstances. On May 18, 1956, the Pattersons gave Alabama notice again that the lease was terminated as of May 22, 1956, because, as they contended, Alabama had not satisfactorily carried out its duties. Demand was made on it to remove all equipment and property and deliver up possession "as soon as possible". Thereafter, Alabama removed only a sufficient quantity of ore from the premises to show that it was not abandoning the lease and delayed further removal until after a determination of this point by the Court.

The Court is of the opinion that the word "satisfactory" as used in the lease means satisfactory to a reasonable person and not to the lessors themselves and that Alabama has satisfactorily carried out its duties under the lease and the renewal was valid and binding.

In McNeil v. Armstrong, 4 Cir., 81 F. 943, 945 the plaintiff contracted to furnish and set tiles on the roof of defendant's house, such work to be done "to the entire satisfaction of" defendant and his architects. Defendant alleged dissatisfaction and plaintiff sued on the contract; the Court held for the plaintiff. The Court said that some slight defects appeared, and these were corrected. Some of the objections were of a trivial nature and others were evidently founded upon a mistake; the Court said:

"It is not necessary to consider that class of cases which holds that a simple allegation of dissatisfaction, without some good reason assigned for it, is to be considered as a mere pretext, and not to be regarded. They fall within the rule that 'that which the law will say a contracting party ought in reason to be satisfied with, that the law will say he is satisfied with.' Where the object of a contract is to gratify taste and personal preferences, a different rule prevails, and parties may not unreasonably be expected to be bound by the opinion honestly entertained of the person whom he undertakes to satisfy, and performance must accord with the terms of the contract. * * * The work to be done in putting on the tiles was defined by the plans, specifications and details prepared by the architects. This involves no question of personal tastes or preferences. The work to be done is specifically defined, and the manner in which it is done is determined by rules that leave nothing to arbitrary caprice."

In Brewster v. Lanyon Zinc Co., 8 Cir., 1905, 140 F. 801, 814, there was a suit to cancel oil lease on the ground lessee failed to exercise diligence in exploring and developing the property. The lease

did not provide specifically to what extent exploration was to be done. The Court held in absence of specific requirements an implied covenant exists.

"The large expense incident to the work of exploration and development, and the fact that the lessee must bear the loss if the operations are not successful, require that he proceed with due regard to his own interest, as well as those of the lessor. No obligation rests on him to carry the operations beyond the point where they will be profitable to him, even if some benefit to the lessor will result from them. * * Whatever, in the circumstances, would be reasonably expected of operators of ordinary prudence, having regard to the interests of both lessor and lessee, is what is required."

This rule is reaffirmed in numerous cases down to Carter v. Certain-Teed Products Corp., 8 Cir., 200 F.2d 754, at page 757.

Watchorn v. Roxana Petroleum Corporation, supra [5 F.2d 637]—The contract in this case worded in part "it shall be the duty of the first party *to duly and properly develop said lands for gas"*, etc. The principal issue was to what extent was defendant obligated to make development of the leased property.

In interpreting the above provision the Court reviewed numerous cases, all cited and quoted, in which similar phrases were used.

Summarizing its decision, the Court said:

"We believe the correct rule to be applied to this contract is that 'duly and properly develop said lands for gas, as the term is used therein, relates to the development of the entire tract considered as an entity, and not to each separate parcel of land, and further that the term as therein used means such reasonable development, taking into consideration the relationship of the parties to each other, and all the circumstances surrounding and involved in the entire transaction covered by the contract, *as would be expected of prudent, skillful, and experienced operators."*

In Title Insurance & Guaranty Co. v. Hart, 9 Cir., 160 F.2d 961, 963, the defendant leased mining property to plaintiff's assignor for a ten-year period, with a provision in the lease that:

"In consideration of, and the faithful compliance thereto by said lessees of the foregoing agreement and covenants therein, the said owner agrees that upon written application of the lessees to grant unto said lessees a further lease upon said mine, its improvements and acquisitions, an extension of this lease for a further term of ten years under the same covenants, royalties and rights."

When plaintiff started its operations, the mine was wholly inoperative and practically worthless. Over the ten-year period he developed it into a profitable enterprise. When, at the end of the ten-year period, plaintiff sought to extend the lease, defendant refused to do so, claiming plaintiff had not "faithfully complied" with the terms of the contract, in that:

(1) Plaintiff had not paid royalties to defendant in full. Such unpaid royalties amounted to $93.19.

(2) Plaintiff had violated the Industrial Accident Commission laws on numerous occasions. (But these violations were all minor and had been corrected.)

(3) Plaintiff had failed to maintain records as to amounts mined and royalties payable to defendant. (But defendant only complained of this when suit was brought, and plaintiff had, after notice of the defect was given, compiled a complete record of production, etc.)

Plaintiff petitioned for a decree that he was in lawful possession and that the lease was validly extended, where notice of such extension was given in due time pursuant to the terms of the lease. Defendant argued that strict compliance with all covenants in the lease was a condition precedent to the granting of a new

lease, and that, while the breaches perhaps would not justify a forfeiture, they were sufficient to warrant defendant's refusal to renew plaintiff's lease.

The Court held the renewal of the lease effective. The following language of the 9th circuit is quoted at some length because it is apropos of the facts and circumstances in the instant case:

"The trial court found no deviation from faithful performance of the lease because of any grossly negligent, wilful, or fraudulent breach of duty, and, viewing the whole record, we are unable to disagree with the trial court.

"Under the terms of the lease faithful performance is the requirement. It is not reasonable in human experience to expect that there could have been full, exact, strict, complete and perfect compliance with all of the covenants. Operators of a mine are dependent on all their employees doing their full duty at all times. Despite the exercise of the highest standard of care some breaches were bound to occur over a 10-year period. At some point during the term some of the records were bound to be 'incomplete' within that covenant of the lease. At certain times, due to the impossibility of human perfection, some of the Mine Safety Orders were bound to be violated.

"But a readiness on the part of lessees to comply when violations were called to their attention is evidenced by the fact that before the Industrial Accident Commission was required to take steps which might have slowed production or otherwise injured lessor, all violations were corrected.

"It is significant that none of the violations alleged under any category materially harmed the productivity of the mine. For it must be kept in mind that lessees took a virtually worthless, wholly inoperative mine at the beginning of their term, and within ten years they had produced nearly one and one-half million dollars worth of ore, paid lessors over $141,000 in royalties, placed nearly $60,000 worth of equipment at the mine, and developed ore in place at the end of their term on which an estimated net profit of some $200,000 may be made.

"Viewed against this background and against the background of the due diligence exercised by appellee in his faithful performance of the lease, we think he has sufficiently complied with the condition precedent."

From the above cases, the Court concludes that there are two types of cases in which the question of satisfactory performance may arise. The first class covers those cases where some act is to be done to the satisfaction of an individual person such as the painting of a portrait or the making of a suit. The other class deals with satisfactory performance rather than meeting the particular desires of an individual. In the first class mentioned, if performance does not satisfy the individual, then he can reject it. In the latter, only such performance is necessary as would satisfy a reasonable person under the circumstances. The lease in question falls into the latter class. The Court concludes from all the circumstances that have been presented, that here Alabama did satisfactorily perform its duties under the lease and that the Pattersons cannot reject such performance from mere whim or caprice.

The following State Court cases point out this distinction and support the Federal Court cases hereinabove cited: Duplex Safety Boiler Co. v. Garden, 1886, 101 N.Y. 387, 4 N.E. 749; Hawkins v. Graham, 1889, 149 Mass. 284, 21 N.E. 312; Bruner v. Hegyi, 42 Cal.App. 97, 183 P. 369; Greenberg v. Lumb, Sup. 1911, 129 N.Y.S. 182; Lockwood Mfg. Co. v. Mason Regulator Co., 183 Mass. 25, 66 N.E. 420; see also 13 C.J. §§ 768, 769; 17 C.J.S., Contracts, § 495; 12 Am.J. §§ 341, 342; 32 Am.J. p. 809, § 962.

It is important to note the particular language in the leases or contracts under

consideration in analyzing cited authorities. See for example Pulsifer v. Walker, 1932, 85 N.H. 434, 159 A. 426, 81 A.L.R. 1052, 1055, and Borden Mining Co. v. H. & W. A. Hutchins Coal Co., 1932, 163 Md. 250, 161 A. 181.

In neither the Pulsifer case nor the Borden Mining case, supra, did the Court distinguish the long line of authorities which point out the distinction in the two types of cases where the question of satisfactory performance arises (i. e. the satisfaction of personal taste and mechanical or operational fitness). These cases represent the minority view and should not be followed by this Court in the face of an abundance of authority to the contrary from many other State and Federal Courts.

■ Measured by the test laid down in the above cases, the performance of Alabama under the lease in question must be held to be satisfactory performance in that it is in accordance with accepted mining practices in the locality and is such as a reasonable person would expect. The renewal for the five-year term is, therefore, valid and binding and the lease will remain in effect for a period of five years from May 22, 1956.

4. Extension of Lease for Period Alabama Was Kept out of Possession by the Pattersons

As the Court has indicated above, Alabama was denied possession of the lease premises for a period of 33 months and 26 days because of the fault of the Pattersons. The periods of time during which Alabama was deprived of possession and the reasons therefor are fully covered by the previous orders of this Court and are, therefore, a matter of record. In addition, they have been referred to in some detail in the first part of this order. Particular reference is called to 1) Conclusion No. 7 of the order of April 20, 1954, wherein the Court found that Alabama was deprived of possession for 28½ months; 2) Conclusion No. 3 of the order dated April 21, 1955, wherein the Court held that the Pattersons had so harassed, intimidated and interfered with Alabama's employees

without justification that the lessee was unable to exercise its right to mine ore under the lease for 4½ months; 3) Order of December 15, 1955, reciting facts concerning the injunction suit of Mrs. Patterson wherein Alabama was denied possession from April 26 to June 22, 1955, 26 days.

■ Under the lease agreement Alabama was entitled to 120 months peaceful possession (original five-year term plus five-year renewal) and upon failure of the Pattersons to give possession for that period of time, Alabama would be entitled to have the lease specifically performed on their part, that is to say, to require the Pattersons to give it 120 months of peaceful enjoyment. The Court, therefore, finds that Alabama is entitled to an extension of the lease for a period of 33 months and 26 days from the expiration date of the renewal term, May 22, 1961.

The following authorities support the conclusion of the Court on this issue: Morgan v. Houston Oil Company, Tex. Civ.App., 84 S.W.2d 312, 314; Millar v. Mauney, 150 Ark. 161, 234 S.W. 498, 503; Winn v. Collins, 1944, 207 Ark. 946, 183 S.W.2d 593; Silverman v. Emerson, Tex. Civ.App.1924, 257 S.W. 612.

White v. Felkel, 1952, 222 S.C. 313, 72 S.E.2d 531. In this case, plaintiff sued the defendants for specific performance of a contract whereby the defendant, Felkel, gave plaintiff one year to cut timber on three tracts of land owned by him. The Court held that the contract was sufficiently definite to support an action for specific performance and that plaintiff was entitled to one year's possession of the premises for the purpose of cutting the saw timber therefrom as provided in the contract. The Court said, 222 N.C. at page 324, 72 S.E.2d at page 536:

"We are constrained to hold that the parties fully understood by the terms used what was included in the agreement and that their minds met with respect to the particulars thereof, thereby bringing the contract within that degree of certainty and

560

definiteness required of a contract to be specifically enforced."

██ Under the doctrine laid down in the case of Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188, this Court is bound to follow the law as laid down by the South Carolina Court of highest resort.

This Court in the case of Clyburn v. Carolina Mining and Exploration Corporation, D.C.E.D.S.C., 149 F.Supp. 518 extended a ten-year mining lease for a period of five years and ten months, a period equal to the time in which operations were suspended for causes beyond the control of the lessee. The wording of the lease in the Clyburn case is slightly different from that in the instant case. It, in terms, provides for an extension for a time equal to such period as operations are impossible by reason of any cause beyond the control of the mining company. The Court is of the opinion that in a lease of the kind under examination here where specific performance is an appropriate remedy, the lessee would be entitled to the full mining time provided in the lease agreement in the absence of any such specific requirement in the agreement itself.

5. Hauling by Truck to the Kearney Processing Plant

The lease as originally written provided for the hauling of ore by boxcars and the payment of royalties based on railroad weights. The provisions were incorporated in it at a time when there was no processing plant in the vicinity of the mine and the ore was to be shipped to processing plants at Travelers Rest, S. C. and other distant points. They were originally designed to cover the situation where the Pattersons were mining the ore as agents of the lessee. A new processing plant at Kearney, S. C., some three miles from the mine, was completed in March of 1956 and the floatation process put into operation on October 23, 1956.

The evidence showed that all the ore which was stockpiled was not merchantable at the time it was removed from the mine; that as to Stockpile No. 1, it was the intention of Alabama to process this ore through the floatation system at the new Kearney mill; that royalties on this stockpile would yield approximately $3,750 based on a rough estimate of the tons contained in this stockpile. The evidence further showed that by hauling to the Kearney plant and using the floatation process, Alabama can use a lower grade of ore than could heretofore be profitably mined where the raw ore had to be transported by boxcars to distant plants at high railroad transportation rates. This ore will be merchantable only if it can be transported by truck to the Kearney plant without the costly procedure of loading it in boxcars and transporting the same by rail.

██ Measurement and payment on railroad weights was a means of accurately determining the tonnage and calculating the payment of royalties through facilities which then existed. The provision regarding measurement and payment by railroad weights was a part of the machinery for fixing the amount due the Pattersons under the lease. It is not an essential part of the lease in the sense that it is a covenant to use said method exclusively when some other adequate and more economical method is provided. It will be more economical to remove the ore by truck to the recently constructed processing plant than to ship it by rail to Travelers Rest or some other distant point. A lower grade ore can be used, larger quantities will be extracted and the Pattersons will get more royalties. Adequate weighing scales have been erected on the road leading to the Kearney mill which are used to measure vermiculite ore of various property owners in the vicinity of the Pattersons' mine. The method of hauling by truck and weighing the ore on these scales and making payment of royalties on the tonnage thus determined is adequate to assure the Pattersons—First, that all raw ore will be accounted for and, Second, that they will receive their royalties as provided for in the lease contract.

Transportation costs are a major item in the mining and processing of vermiculite ore and a Court of equity should not

impose an unnecessary burden upon the parties merely to preserve machinery devised for other circumstances and conditions. Alabama has extended to the Pattersons an opportunity to verify the measurements of the ore removed. The Court should not decree otherwise. The action of the Court in this instance is fully sustained by the decision in Hewlett v. Goodwin-Gallagher Sand & Gravel Corp., 1930, 253 N.Y. 502, 171 N.E. 758. In that case, the lease provided for rendering a statement of the quantity of sand and gravel removed and that "all sand and gravel shall be measured in the vessels on which it is loaded and at the dock where the same is loaded." The defendant found that it was more economical to remove the material to an existing plant by railroad cars rather than by vessels, and afforded the lessor a reasonable opportunity to verify the measurement of the excavated material. The Court said, 171 N.E. at page 759:

"There can be no doubt that the parties expected that the material would be removed from the premises by vessels, and in view of that expectation they provided for measurement at the dock or on the vessels. The expectation has proven false. The defendant has found it more economical to remove the material to an existing plant than to erect a new plant on the premises. Measurement on vessels is merely part of the machinery for fixing the amount due under the lease. It is not an essential part of the lease and does not justify reading into the contract, by implication, a covenant to build docks and load vessels on the premises merely to facilitate the measurement of the material removed. A court of equity should not by its fiat impose an unnecessary burden upon the parties merely to preserve machinery devised for other conditions. The defendant does not refuse the plaintiff reasonable opportunity to measure the material removed. The court should not decree more."

Alabama will, therefore, be permitted to remove vermiculite ore by truck from the mine to the processing plant at Kearney, S. C., as outlined in Paragraphs 6 and 7 of the memorandum of decision heretofore filed.

In view of the foregoing, it is ordered, adjudged and decreed:

(1) That the motion of Alabama for a judgment notwithstanding the verdict be, and the same is hereby, denied.

(2) That the verdict against Alabama was against the manifest weight of the evidence and should be set aside and a new trial be, and the same is hereby, granted.

(3) Mrs. Patterson is entitled to ⅛th of the royalty payable under the lease for her inchoate right of dower.

(4) That Alabama has validly complied with the provisions regarding a renewal of the lease for five years from May 22, 1956, and the lease is hereby declared to be renewed and its termination date fixed at May 22, 1961.

(5) That the lease should be extended for 33 months and 26 days from May 22, 1961, said time representing the period that Alabama was unlawfully kept out of possession through the default or breach on the part of the Pattersons.

(6) Alabama should be continued in possession of the property with the right to continue to mine the same, including the removal of ore previously stockpiled.

(7) The lease provisions regarding measurement by railroad weights was merely a part of the machinery for fixing the amount due under the lease. Allowing shipment by truck will result in further utilization of the ore deposit by rendering some ore merchantable which would otherwise be unmerchantable. Shipment by truck is, therefore, permitted.

(8) Alabama is authorized to haul the merchantable vermiculite ore mined from said premises, including the ore previously stockpiled, by truck to the processing plant of Zonolite at Kearney, South Carolina, weigh the same on the scales

562

of said company located on the road leading from the public highway to said processing plant and furnish the Pattersons with a record of said weights and pay them 75¢ per ton for such unprocessed merchantable vermiculite ore. Alabama shall be liable for payment of said royalty at the time the ore is removed from the premises and weighed at the scales of Zonolite Co. The time of payment to the lessors and Mrs. Patterson shall be that specified in Paragraph 10 of the lease.

(9) That the Court shall retain jurisdiction of this cause, and that nothing herein contained shall be construed as reversing, overruling or setting aside the previous orders of this Court dated April 20, 1954, April 21, 1955 and December 15, 1955, respectively.

And it is so ordered.